Earl D. GREENE, Appellant,

v.

UNITED STATES of America,
Appellee.

John BECKER, Appellant,

v.

UNITED STATES of America,
Appellee.

Mike A. THOMAS, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 22104, 22104–A and 22104–B.

United States Court of Appeals,
Ninth Circuit.

Nov. 23, 1971.

Rehearing Denied Feb. 3, 1972.

Merrill, Circuit Judge, filed dissenting opinion.

Charles O. Morgan, San Francisco, Cal. (argued), for John Becker.

Leonard P. Burke (argued), of Scalora & Burke, Sacramento, Cal., for Mike A. Thomas.

James Neil, San Jose, Cal. (argued), for Earl D. Greene.

Brewster Q. Morgan, Asst. U. S. Atty. (argued), Dwayne Keyes, U. S. Atty., James J. Simonelli, Asst. U. S. Atty., Sacramento, Cal., for appellee.

Before HAMLEY, MERRILL and HUFSTEDLER, Circuit Judges.

HAMLEY, Circuit Judge:

Mike A. Thomas, John Becker and Earl D. Greene, were jointly indicted, tried and convicted on charges involving possession of unregistered distilling apparatus, sale without stamp of distilled

spirits, and conspiracy.[1] The three took separate appeals which we consolidated for argument and disposition. While these appeals were pending, defendant Greene was murdered. As to his appeal it is, therefore appropriate to remand with directions to vacate the judgment and dismiss the indictment. We reverse the convictions of Thomas and Becker for the reasons stated below.

In September, 1962, Jack Courtney, a special investigator with the Alcohol and Tobacco Tax Division of the United States Treasury Department, assumed the role of an undercover agent in an effort to penetrate what he believed to be an organization which was selling bootleg whiskey. Posing as a gangster or member of the "syndicate," he was, on September 5, 1962, introduced to defendants Thomas and Becker by Gerald Brown, an informer for the Oakland Police Department. The events which thereafter unfolded reveal almost unbelievable naïveté on the part of defendants in accepting Courtney as a representative of the "syndicate." More important, however, they disclose wholly impermissible participation by the Government, through its regularly-employed agent, Courtney, in a project to manufacture, sell and distribute bootleg whiskey.

Courtney held himself out to Thomas and Becker as a gangster because he had received information through a police informer that Thomas and Becker were attempting to locate a "syndicate" connection to purchase large quantities of moonshine whiskey. During the course of their September 5, 1962, meeting, Thomas and Becker told Courtney that they had sold non-tax paid alcohol to the public prior to meeting Courtney, but indicated that they preferred one buyer.

They also told Courtney that if he wanted to deal with them he would have to be able to take delivery of one hundred to two hundred gallons of bootleg whiskey a week. Courtney told them he was in a position to accept whatever they could produce.

Later that same evening Becker took Courtney to his home in Oakland and gave Courtney a sample of Becker's and Thomas' bootleg whiskey. Becker and Thomas at that time described their then-existing still set-up to Courtney. During Courtney's 1962 association with Thomas and Becker, and in order to play the part of a gangster, Courtney showed Thomas and Becker strip stamps, displayed labels in the back of his car, and told them he had a bottling plant as part of the syndicate operation.

On September 10, 1962, Courtney purchased eight gallons of illegal distilled spirits from Becker and Thomas. As a result of Courtney's activities, government agents, in October 1962, located and raided a still on Thomas' property near Sacramento. In early 1963, Thomas and Becker pleaded guilty to charges similar to those alleged in the instant indictment. Both were sentenced to six months in jail and were released from custody in November, 1963.

In late 1962, while the 1962 case was pending and Becker was free on bail, Courtney initiated telephone contact with Becker concerning further relationship between them. Courtney's purpose was to determine whether his undercover identity had been compromised. During the telephone call, Becker manifested a lack of awareness of Courtney's true identity.

Courtney had no further contact with Thomas or Becker until, in December,

1. The convictions were as follows: Count I—Thomas and Becker were convicted for violation of 18 U.S.C. § 371—conspiring with each other and with Earl D. Greene, Alva B. Curtice and others, to violate 26 U.S.C. § 5601, possession and use of unregistered distilling apparatus, and removal and concealment of spirits produced thereby; Count II—Thomas was convicted for violating 26 U.S.C. § 5601 (a) (1), possession of unregistered distilling apparatus; Count III—Becker and Greene were convicted for violating 26 U.S.C. § 5604(a) (1), sale without stamp of distilled spirits; and Count IV—Thomas and Becker were convicted for violating 26 U.S.C. § 5604(a) (1).

1963, he received a letter from Becker, quoted in the margin.[2] The telephone call referred to in the letter was Courtney's 1962 call to Becker, mentioned above.

After receiving the December, 1963 letter, Courtney telephoned Becker and arranged to meet Thomas and Becker at the Hyatt House in San Jose, on February 8, 1964. At the meeting, Courtney continued his role as a big-time gangster. He talked to Thomas and Becker as if the three were partners, offered financial assistance so that Becker could bribe his probation officer, and offered to buy all the alcohol they could produce.

Thomas and Becker informed Courtney at that meeting that they intended to go back into the bootlegging business, that Thomas would be in charge of the still operation, and that they wished Courtney to check periodically with Becker to ascertain their progress. However, they also stated that they had no still at that time.

The meeting lasted seven or eight hours on February 8th, during which time Courtney took Becker and Thomas out to dinner, and continued on February 9th. On the 9th, by the end of the meeting, Thomas and Becker were saying that they would get into production within ninety days.

However, when the three next met, at the Hilton Inn, San Bruno, on May 27, 1964, Thomas and Becker indicated that they were having difficulty getting into operation. At this time Courtney, in an effort to spur production of bootleg whiskey, told Thomas and Becker, "the boss is on my back." On October 22, 1964, some eight months after they had said they would be in production in ninety days, Becker and Thomas made their first delivery of bootleg alcohol to Courtney since their conviction in 1962. The ship-ment consisted of ten gallons, for which Courtney paid one hundred dollars.

Shortly after this first small delivery, flooding in Northern California apparently disrupted the defendants' still operations. However, they did manage, after another delay of more than four months, to make a thirty-five gallon delivery to Courtney for four hundred and fifty dollars, on March 3, 1965.

Thereafter, there was a fifteen-month delay before the third and final shipment of illicit spirits was made. On June 4, 1966, sixty gallons of alcohol was delivered to a government agent in Sacramento, for which Courtney paid Becker seven hundred and eighty dollars. Immediately thereafter, Courtney arrested Becker and the still site near Ceres, California was raided, thus bringing the undercover role of Courtney to an end.

During the protracted intervals between the three deliveries, there were several other meetings and extensive additional contracts among the individuals involved. Of the thirty-two letters, telephone calls and telegrams between Courtney and either Thomas or Becker, or both, between December 16, 1963 and June 4, 1966, twenty-two were initiated by Courtney.

Courtney also looked for a new distillery site for defendants at their request, going so far as to arrange for the use of a ranch near Sparks, Nevada, which he showed to Thomas and Becker in 1965. After some deliberation, they decided not to use that site.

In addition Courtney, at one time or another during the two and one-half year period involved, offered to have a still apparatus sent from the East if that of the defendants was unsatisfactory, offered to furnish a still operator (known as a "monkey"), and told Thomas and Becker that he thought he could obtain

2. "Dear Jack: Sorry I couldn't talk to you the last time you called, but I didn't want people to listen in on our conversation. I'm back in circulation now, and it's very important that I see you. Contact me at my office. I'm usually there from 8:00 a. m. to 7:00 p. m., six days. I'll enclose my card so you can contact me there. Like always, Johnnie."

plastic containers for them. Also, after some discussion, Courtney in 1966 made available to Thomas and Becker, at wholesale prices, two thousand pounds of sugar for use in their bootleg operations.

It is undisputed that, during the extended period relevant to the charged offenses, the defendants sold illicit spirits only to the Government, through its undercover agent Courtney.

At the trial, Courtney testified that his dealings with the defendants had been protracted and extensive because of the Government's goal of finding the still and shutting it down, and because of the defendants' caution and unwillingness to disclose the details and location of their operation. Thomas and Becker, on the other hand, argued that while they talked in grandiose terms of criminal activity to impress the "syndicate man," they were reluctant to act and might never have produced any bootleg alcohol without the prodding of Courtney. To support this argument, they stressed Courtney's additional testimony that although he, as an experienced law officer, knew they were stalling him, he kept on in order to get them to sell him some liquor.[3]

On this appeal, both Thomas and Becker argue that, under the described evidence, there was entrapment as a matter of law and the motions for judgment of acquittal should for that reason have been granted.

■ The facts reviewed above do not disclose a typical example of entrapment. Entrapment is shown where government agents go beyond the mere affording of opportunities or facilities for the commission of the offense and exert persuasion or pressure of one kind or another which induces the commission of a crime by one who had no predisposition to do so. Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); Sorrells v. United States, 287 U.S. 435, 442, 53 S.Ct. 210, 77 L.Ed. 413 (1932); United States v. Walton, 411 F.2d 283, 288 (9th Cir. 1969). Defendants Thomas and Becker had a predisposition to manufacture and sell bootleg whiskey from the time of Courtney's first contact with them, and the usual entrapment defense is therefore not available.[4]

■ However, the facts presented by this unique record do reveal circumstances which, in combination, require reversal of these convictions. First, it was Courtney who, after the 1962 raid and arrest, re-initiated telephone contact with Becker. This re-establishment of contact occurred at a time when Courtney would ordinarily have had no reason to re-contact the defendants, because his earlier undercover work had been successfully completed.

Second, the course of events which led to the 1966 arrests was of extremely long duration, lasting approximately two and one-half years if measured from the defendants' 1963 release from jail, or three and one-half years if measured from Courtney's reinitiation of contact.

Third, Courtney's involvement in the bootlegging activities was not only extended in duration, but also substantial in nature. He treated Thomas and Becker as partners. He offered to provide a still, a still site, still equipment, and an operator. He actually provided two thousand pounds of sugar at wholesale.[5]

---

3. Courtney testified: "Q. Now, isn't it correct, sir, that about this time you, as an experienced law officer, knew that the Defendants were stalling you? A. Yes. Q. But you didn't stop, did you? A. No. Q. You kept on to get them to sell you some liquor, didn't you? A. Yes." (R.T. 898).

4. Becker had indicated to a police informer after the 1962 still raid that he intended "to continue" after his then-current problems had subsided.

5. Courtney, we note, was not just a government informer. He was a regularly-employed special investigator of the federal Alcohol and Tobacco Tax Division. Had he been acting in a private capacity, the facts stated above would label him an aider and abettor, and a co-conspirator with Thomas and Becker.

Fourth, Courtney applied pressure to prod Becker and Thomas into production of bootleg alcohol. The Government concedes that Courtney made the statement, "the boss is on my back." And we believe that in the context of criminal "syndicate" operations, of which Courtney was ostensibly a part, this statement could only be construed as a veiled threat.

Fifth, the Government, through its agent Courtney, did not simply attach itself to an on-going bootlegging operation for the purpose of closing it down and prosecuting the operators. Any continuing operation had been terminated with the 1962 raid and arrest. We think, rather, that the procedure followed by Courtney in this case helped first to reestablish, and then to sustain, criminal operations which had ceased with the first convictions.

Finally, throughout the entire period involved, the government agent was the only customer of the illegal operation he had helped to create. It is undisputed that the only alcohol sold went to Courtney, who paid for it with government funds.

It is true that the Government offers plausible explanations for some of Courtney's actions. We also acknowledge that, taken individually, none of the factors which we have pointed to as significant would necessarily require reversal of a conviction. In our view, it is the combination which is important.

We do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators. As pointed out in Sherman v. United States, *supra*, 356 U.S. at 372, 78 S.Ct. at 821, a certain amount of stealth and strategy "are necessary weapons in the arsenal of the police officer." But, although this is not an entrapment case, when the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent

which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative. Under these circumstances, the Government's conduct rises to a level of *"creative* activity" (*Sherman, supra,* at 372, 78 S.Ct. at 821), substantially more intense and aggressive than the level of such activity charged against the Government in numerous entrapment cases we have examined.

Our reversal on the above ground makes it unnecessary to consider appellants' other points on appeal.

With regard to defendants Thomas and Becker, the judgments are reversed and the causes are remanded for dismissal of the indictment. With regard to defendant Greene, the cause is remanded with directions to vacate the judgment and dismiss the indictment.

MERRILL, Circuit Judge, (dissenting):

I dissent from the judgments in favor of Becker and Thomas.

Were this a case of assistance urged on reluctant suspects who desired to abandon a project, I would regard it as a case of entrapment. As the majority notes, however, the crime was conceived by appellants and they were, throughout, predisposed to commit it. As I read the record, they were more than predisposed; they were eager to make the big time with the assistance of the government agent in meeting their production problems.

The majority concludes that while this is not a case of entrapment the same underlying objections which render entrapment repugnant are operative here. I disagree. Government involvement throughout was in response to the requests and needs of the appellants, and the extent of involvement was fixed by the extent of those requests and needs. The government agent was doing no more than playing his cover role, which, in

terms of involvement and the rendering of assistance, was a demanding one.

Entrapment as I view it is repugnant not because the Government has, through successful infiltration of a conspiracy, become an active participant in a criminal enterprise; it is repugnant because the Government has acted unworthily or unfairly in inducing commission of the crime. I do not regard it as unworthy or unfair to play a demanding cover role or to take advantage of the eagerness and naivete of suspects.

While I, too, have feelings of uneasiness about the extent of government involvement here, they do not stem from a sense of unworthiness but from a sense of unwisdom. I would question the administrative judgment that putting these small-time criminals back in jail was worth this elaborate expenditure of effort.

There may some day be a case where, through original conception, leadership and planning, government control is so pervasive as to render the crime in its entirety a governmental enterprise and where, on grounds other than entrapment, immunity should be extended to the criminal participants. I do not find that case here.

Finally I would note that the telephone call from the government agent to Becker while the 1962 case against appellants was pending (to which call the majority opinion refers) did not suggest that illegal activities be resumed when Becker was free to do so. It was at most an inquiry as to whether Becker needed help. Had it urged a return to criminal activities I would readily concur with the majority. I do not like the discouragement of rehabilitation implicit in "Call me when you are out and we can take up just as before." I would regard such an invitation as entrapment of a very special and invidious sort, with lack of predisposition conclusively presumed.