**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Terry Cray STENBERG,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Loren Jay ELLISON,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Earl K. FIKE, Jr., Defendant-Appellant.**

**Nos. 85–3031, 85–3033 and 85–3040.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 6, 1985.

Decided Oct. 21, 1986.

James C. Kilbourne, F. Henry Habicht, II, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

James M. Ragain, Hendrickson & Everson, Billings, Mont., Christopher P. Thimsen, Brad Arndorfer, Cate Law Firm, Billings, Mont., for defendant-appellant.

Before ALARCON and REINHARDT, Circuit Judges, and STEPHENS,* District Judge.

REINHARDT, Circuit Judge:

In these consolidated cases, defendants Terry Cray Stenberg, Loren Jay Ellison and Earl K. Fike, Jr. appeal their convictions for violations of the Lacey Act, 16 U.S.C. §§ 3372(a), 3373(d) (1985). Ellison and Fike also appeal their convictions for violations of the Eagle Protection Act, 16 U.S.C. § 668 et seq. (1982). We affirm Ellison's conviction on all counts but reverse Stenberg's. We reverse Fike's conviction on the count involving guiding services and affirm his conviction on the remaining four counts.

## I. BACKGROUND

### A. *Operation Trophykill*

These three cases arose out of an undercover investigation by the United States Fish and Wildlife Service (FWS) into the illegal taking and sale of wildlife in interstate commerce. The investigation, known as Operation Trophykill, lasted from November 1981 to October 1984 and covered six states and several foreign countries. FWS Agent John Gavitt was the lead investigator in Operation Trophykill. Under the name of John Cummings, Gavitt acted as the business manager of a taxidermy operation located in Colorado. Operation Trophykill was extended to Montana after Gavitt received information from a local FWS agent and others, during the Fall of 1982, that protected wildlife was being sold and guiding services were being provided in and around Yellowstone National Park and the Livingston, Montana area.

### B. *Ellison*

Gavitt first became aware that Loren Ellison might be involved in illegal activities as a result of a conversation with a man in Montana named Larry Myers. Gavitt had contacted Myers after receiving information that Myers was a "middle man" in the sale of elk antlers to K.L. Kim, who allegedly purchased the antlers for sale in

* The Honorable Albert Lee Stephens, Jr., Senior United States District Judge for the Central District of California, sitting by designation.

the Orient. On November 3, 1982, Myers had told Gavitt that he knew of a frozen grizzly bear for sale, and, when Gavitt expressed interest, Myers stated that Ellison either had the bear or knew how to get it. When Gavitt telephoned Ellison on November 4, 1982 to discuss the possibility of obtaining the grizzly bear, Ellison stated that he did not have a grizzly but that, if he did, it would cost $5,000.[1]

Gavitt contacted Ellison again by phone on November 7, 1982. Ellison asked whether Gavitt worked for "Fish, Wildlife and Parks" and affirmed that he had been "gettin' a lot of heat around there." Ellison also stated that he knew of people with grizzly bear rugs for sale, but that grizzlies were "too hot to handle" and he had only elk antlers for sale. When Gavitt asked if Ellison would be willing to serve as a hunting guide for some of Gavitt's "clients" who did not have hunting licenses, Ellison expressed interest. As a result of several more exchanges, Ellison and two of his associates guided FWS Agent Adam O'Hara on an illegal elk hunt in January 1983. During the hunt, O'Hara killed a bull elk, and Ellison shipped the cape to Gavitt in Colorado.

Also in January 1983, Ellison accompanied Gavitt on a trip to Ennis, Montana, where Gavitt planned to sell a load of elk antlers. During the journey, Ellison stated that he had a reputation as a stealer of elk antlers from Yellowstone National Park, which fortunately kept the authorities from focusing on his wildlife hunting activities, and that he had made over $30,000 from selling antlers. He claimed that in one transaction two years ago he had sold over eight tons of antlers to K.L. Kim; he also said that in the most recent year he and his partners had taken over one ton of antlers from the Park. Ellison further told Gavitt that five years previously he and a friend had killed twenty-one mule deer and that such deer were his "specialty."

At the end of January 1983, Ellison contacted Gavitt and stated that he had recently killed two big horn sheep. Gavitt initially said he was interested, and during the next few weeks a possible sale of the sheep was discussed several times over the telephone. Ellison later told Gavitt he had sold the sheep to someone in Billings, Montana. At the trial, a Billings resident named Morris Nielson testified that he purchased one sheep's head from Ellison in February for $350. The sheep were killed out of season and Ellison had no license to kill them.

On August 30, 1983, Gavitt met Ellison at his trailer just as Ellison was leaving for an off-season, and therefore illegal, elk hunt. Ellison told Gavitt he would sell him the antlers and cape if he killed an elk. The hunt proved unsuccessful, but on September 2, 1983 Ellison sold Gavitt two sets of velvet antlers that he had acquired during previous illegal killings. Ellison told Gavitt he had originally intended to sell the antlers to K.L. Kim, but there had been too much "heat."

Ellison served as a guide for FWS Agent Pete Nylander, another of Gavitt's "clients," on a hunt in September 1983. During the hunt Ellison stated that he killed fifteen deer and ten elk each year. He also fired a double-barrelled shotgun into a tree and said that if a game warden confronted them he would "blow his fucking head off."

Ellison contacted Gavitt by phone on November 28, 1983 and offered to sell him two elk capes. Gavitt wired Ellison $180, and Ellison shipped the capes to Gavitt in Colorado where they arrived on December 12, 1983.

Operating on information from a hunting guide in Oklahoma that someone in Montana was selling eagles, Gavitt asked Ellison during a phone conversation February 12, 1984 whether he knew the individual to whom the guide referred. Ellison said he did not, but stated that he did know some

---

**1.** Gavitt placed two phone calls to Ellison on November 4, 1982. The first conversation was not recorded; the second, which we rely upon, was recorded and was played to the jury. All references to phone conversations in this opinion are based on transcripts of tapes introduced into evidence and played in court.

people who had eagles and that he would attempt to get some for Gavitt. Between February 28, 1984 and June 5, 1984, in five separate transactions, Ellison sold Gavitt thirteen golden eagles for $200 each and one golden eagle for $75.

In May 1984 Gavitt phoned Ellison and asked if Ellison would have velvet antlers for sale again that year, and Ellison said "probably." Following subsequent discussions, Ellison sold Gavitt one set of velvet antlers for $600.

Over the course of the investigation, Ellison had become a central figure. He claimed to support himself entirely by his illegal wildlife transactions, and through him Agent Gavitt was introduced to many others engaged in similar activities.

Ellison was indicted for felony and misdemeanor violations of the Lacey Act and the Eagle Protection Act.[2] Before trial, Ellison moved the court to dismiss all the charges against him or, in the alternative, to bar prosecution on the ground of excessive and outrageous government conduct during the course of the investigation. The court denied the motion. Ellison re-newed this motion following the government's presentation of its case-in-chief and at the close of trial, and the court denied the motion each time.

Ellison contended during trial that he had been entrapped, and the issue was submitted to the jury. The jury found Ellison guilty of the charges relating to the sale of two sets of velvet antlers on September 2, 1983, the sale of fourteen eagles between February 28, 1984 and June 5, 1984, and the sale of one set of velvet antlers on July 20, 1984. The jury deadlocked on the charges relating to the hunt with Agent O'Hara in January 1983 and the sale of two elk capes in December 1983. The judge sentenced Ellison to consecutive prison terms totalling fifteen years and to five years of probation to be served at the expiration of the prison term.

## C. *Fike*

Gavitt first met Earl Fike on January 7, 1983 when Ellison introduced the two. Ellison had previously told Gavitt of a friend of his who would be willing to serve as a

---

2. 16 U.S.C. § 3372(a), the Lacey Act Amendments of 1981, provides:

It is unlawful for any person—
(1) to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken or possessed in violation of any law, treaty, or regulation of the United States ...
(2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—
(A) Any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law....

16 U.S.C. § 3373(d), the Lacey Act Amendments of 1981, provides:
(1) Any person who—
(A) knowingly imports or exports any fish or wildlife or plants in violation of any provision of this chapter (other than section 3372(b) of this title), or
(B) violates any provision of this chapter (other than section 3372(b) of this title) by knowingly engaging in conduct that involves the sale or purchase of, the offer of sale or purchase of, or the intent to sell or purchase, fish or wildlife or plants with a market value in excess of $350, knowing that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law, treaty or regulation, shall be fined not more than $20,000, or imprisoned for not more than five years, or both....
(2) Any person who knowingly engages in conduct prohibited by any provision of this chapter (other than section 3372(b) of this title) and in the exercise of due care should know that the fish or wildlife or plants were taken, possessed, transported or sold in violation of, or in a manner unlawful under, any underlying law, treaty or regulation, shall be fined not more than $10,000, or imprisoned for not more than one year, or both. ...

The Eagle Protection Act, 16 U.S.C. § 668(a), provides:
Whoever ... shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, ... shall be fined not more than $5,000 or imprisoned not more than one year or both. ...

guide for Gavitt's clients on illegal mountain lion hunts. When Fike met Gavitt he stated that he had served as a guide for several years and that for more than five years he had had neither a license to do so nor the tags required in connection with the killing of mountain lions. He also stated that he would be willing to serve as a guide for Gavitt's clients, despite the fact that neither he nor the clients would have any of the necessary licenses, and quoted a price of $500 per hunt. If a client failed to kill a lion, Fike would provide, for an additional $500, a skin from a lion he had killed previously. Fike stated that he had arranged to serve as a guide for an out-of-state client beginning January 9, but that he would be free to work for Gavitt after January 15. In addition, Fike stated that he had recently killed three mountain lions, although he usually had killed twelve by this point in the season,[3] and that two days earlier he had sold the skin from one. When Fike asked if Gavitt were interested in purchasing the remaining two skins, which, Fike warned, were untagged and therefore illegal, Gavitt said yes. Gavitt then proceeded with Fike and Ellison to Fike's house, where Fike produced two rolled-up lion skins and two skulls. He also produced the pelt of a mink he claimed to have killed that day; he said he had hidden the pelt because he believed that mink season had ended.[4] Fike initially asked for $1000 for the two skins and two skulls, but, after negotiations, eventually agreed to accept $600 for the skins, the skulls, and the mink pelt.

In the ensuing weeks Gavitt and Fike talked several times over the phone, and Fike agreed to take one of Gavitt's clients on a mountain lion hunt and ship Gavitt the skins of any lions killed. During one conversation Fike stated that on the preceding day he had served as a guide for a Canadian man who killed a mountain lion but had no tag. The planned hunt with Gavitt's client never took place because of lack of adequate snow cover.

In May 1983, during an inadvertent meeting at a cafe, Fike told Gavitt that he needed money badly and that four years ago he had served as a guide on an illegal goat hunt and had killed one goat himself. In August of that year Fike agreed to serve as a guide on a goat hunt, although he was informed that Gavitt's client would not have a license, and to send Gavitt the cape and horns of any animal killed. During one phone conversation, Fike remarked, "I do this stuff all the time." The hunt took place in September 1983, and the client, FWS Agent O'Hara, killed a goat out of season and without a tag. O'Hara paid $600 for the hunt, plus $50 to cover the cost of shipping the cape and horns to Gavitt.

In November 1983 Fike initiated contact with Gavitt and informed him that he had a mountain lion skin for sale and that he needed money badly. Gavitt initially offered $275, but eventually acceded to Fike's request for $300. Gavitt wired the money, and Fike shipped the skin, without a tag, to Colorado.

After December 1983, Gavitt had no contact with Fike until the two met accidentally in June 1984. During that meeting Fike offered to sell Gavitt the skin and skull of a mountain lion, which he stated had not been tagged, for $500. While this transaction was being consummated in Fike's cabin, Ellison arrived with some eagle parts he intended to sell to Gavitt. Later that day Fike stated that he had not known Gavitt was interested in eagle parts, that he had sold twenty eagle carcasses to someone several years ago, and that he killed 5 to 7 eagles per year. Fike then sold Gavitt one bald eagle tail fan, two golden eagle tail fans, and twenty-five eagle talons for a total of $200.

Fike was indicted for violations of the Lacey Act and the Eagle Protection Act based on the following transactions: the

---

3. It was undisputed at trial that Montana law limited each hunter to one mountain lion per year.

4. It was undisputed at trial that mink season ended on December 31, 1982.

sale of two mountain lion skins, two skulls, and one mink pelt in January 1983; the sale of guiding services for the hunt in which a goat was killed in September 1983; the sale of one mountain lion skin in November 1983; the sale of one mountain lion skin and skull in June 1984; and the sale of various eagle parts in June 1984. Before trial, Fike moved to dismiss or bar prosecution on the ground that the government's conduct was outrageous. His motion was consolidated with Ellison's and was denied. At trial, Fike claimed that he had been entrapped. The jury found him guilty on all counts. He was sentenced to consecutive five year prison terms on each of the first two counts to be followed by five years of probation on the remaining three; the court imposed additional prison terms on the last three counts but then suspended "imposition" of sentence.

### D. *Stenberg*

The facts alleged by the government in Stenberg's case, and which he concedes to be true for purposes of his appeal, are found in a Federal Wildlife Service Report of Investigation regarding the January 1983 elk hunt on which Ellison served as a guide for Agent O'Hara. With respect to Stenberg's role in the hunt, the Report provides the following account:

When O'Hara flew into Montana for the hunt, Stenberg met him at the airport and took him to his hotel room. That night, O'Hara asked Ellison if he was guaranteeing that an elk would be killed, and Ellison replied, "Oh, yeah, we'll get you one." O'Hara agreed to pay Ellison $150 per day for a minimum of four days and to pay Stenberg $150 for a special season elk tag which was valid only for January 23 and 24 and only for certain areas.[5] On January 24, 1983 O'Hara, Stenberg, Ellison, and a fourth person, Harvey Amundson, searched for elk in both the permit area

and a no-hunting zone, but none shot an elk that day. The next day the party proceeded immediately to the no-hunting zone where O'Hara killed an elk. Stenberg kept the meat of the elk, and Ellison later shipped the cape to Gavitt. Ellison paid Amundson for his help, but did not pay Stenberg.

On the basis of this alleged conduct, Stenberg was indicted for a felony violation of the Lacey Act arising from the sale and purchase of wildlife. He moved to strike from the indictment all allegations relating to him on the ground that, even assuming the alleged facts in the Report were true, as a matter of law his conduct did not constitute the sale or purchase of wildlife. He argued that neither the furnishing of guiding services nor the provision of an elk hunting permit constitutes the sale of wildlife. The court denied the motion. Stenberg then entered a conditional plea of guilty, pursuant to Federal Rule of Criminal Procedure 11(a)(2), to a reduced misdemeanor violation of the Lacey Act, reserving his right to appeal the denial of his motion to strike. The court sentenced Stenberg to a one-year prison term.

## II. OUTRAGEOUS GOVERNMENT CONDUCT

Ellison's sole argument on appeal, and one of several contentions raised by Fike, is that the government's conduct in this case was so outrageous that it violated his right to due process.[6] Although both defendants label this defense "entrapment as a matter of law," there is a distinction between the entrapment defense, whether raised as a matter of law or fact, and the argument that government conduct is so outrageous as to violate due process. While there is frequently some overlap between the concepts underlying the two defenses, the entrapment defense essentially requires an inquiry into the defendant's

---

**5.** Montana law provides that no person may loan or transfer a hunting license to another, nor may any person use the license other than the one to whom it is issued. Mont. Code Ann. § 87-2-110 (1983).

**6.** Whether the government's conduct violated defendants' due process rights is a question of law which we review *de novo*. *E.g., United States v. Bogart,* 783 F.2d 1428, 1431 (9th Cir.1986).

predisposition to commit the crime with which he is charged, *see, e.g., United States v. Marcello*, 731 F.2d 1354, 1357 (9th Cir.1984), and the outrageous government conduct defense focuses, not surprisingly, on the conduct of the government, *see, e.g., United States v. So*, 755 F.2d 1350, 1353 (9th Cir.1985).

In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court recognized that there may be "situation[s] in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643 (citation omitted). A plurality of the Court in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), concluded that the outrageous conduct defense was not available to a defendant who was predisposed to commit the crime, *id.* at 490, 96 S.Ct. at 1650, but a majority of the Court rejected this view and recognized the validity of the defense in appropriate circumstances irrespective of the defendant's criminal predisposition, *see id.* at 495 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring, joined by Blackmun, J.); *id.* at 497, 96 S.Ct. at 1653 (Brennan, J., dissenting, joined by Stewart and Marshall, J.J.). We recently reaffirmed the view we have consistently expressed. In *United States v. Bogart*, 783 F.2d 1428 (9th Cir.1986), we held that, regardless of evidence of predisposition, "a defendant may raise a due process-based outrageous government conduct defense to a criminal indictment." *Id.* at 1433 (citing cases).

■ We have also stated that "the due process channel which *Russell* kept open is a most narrow one." *United States v. Ryan*, 548 F.2d 782, 789 (9th Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976), *and* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977). The outrageous government conduct defense is available only where "the government is so involved in the criminal endeavor that it shocks our sense of justice." *So*, 755 F.2d

at 1353; *see also, e.g., Shaw v. Winters*, 796 F.2d 1124, 1125 (9th Cir.1986) ("violation of 'fundamental fairness, shocking to the universal sense of justice' ") (quoting *Russell*, 411 U.S. at 432, 93 S.Ct. at 1643, quoting *Kinsella v. United States*, 361 U.S. 234, 246, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960)). Constitutionally unacceptable conduct includes, but is not limited to, situations where law enforcement agents employed unwarranted physical or mental coercion, *see Bogart*, 783 F.2d at 1438, where "government agents engineer and direct the criminal enterprise from start to finish," *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983), and where the government essentially manufactures new crimes in order to obtain the defendant's conviction, *see id.* at 540; *Bogart*, 783 F.2d at 1438. On the other hand, the outrageous conduct defense is generally unavailable where the criminal enterprise was already in progress before the government became involved or *where the defendant was involved in a continuing series of similar crimes during the government conduct at issue. See Bogart*, 783 F.2d at 1437–38 (citing cases).

■ There appears to be a conflict in our cases concerning the appropriate standard for reviewing the evidence when the outrageous government conduct defense is raised. In *United States v. Bagnariol*, 665 F.2d 877 (9th Cir.1981) (per curiam), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982), we stated that we must view the evidence in the light most favorable to the prevailing party, in that case the government. *Id.* at 880, 883. On the other hand, we recently stated in *United States v. Bogart*, 783 F.2d 1428 (9th Cir. 1986), that, where pertinent factual matters are in dispute, an appellate court ordinarily may not resolve an outrageous conduct issue without the benefit of factual findings by the district court. *Id.* at 1434. While we believe the latter approach is the correct one, it is not necessary for us to resolve the conflict here, nor in any event would it be appropriate for us to do so

without first suggesting en banc consideration by the court.

 The government extended Operation Trophykill to Montana on the basis of information that individuals near Yellowstone Park were violating wildlife laws. Agent Gavitt met both Ellison and Fike only after his investigation indicated they were already involved in continuing illegal transactions involving wildlife. There was substantial evidence presented at trial that both Ellison and Fike were engaged in such continuing illegal activity during the period Gavitt was investigating them. This evidence included tape recordings of telephone conversations, clear and direct testimony of government agents, and, in Ellison's case, testimony of witnesses unassociated with the government. Fike presented no contrary evidence other than his bare uncorroborated denial. Ellison did present some contrary evidence, although he fails to mention any in his brief. However, even in Ellison's case, some of the government's evidence stands unrefuted. In addition, the jury considered all of this evidence in connection with both defendants' claims of entrapment and rejected the defense.[7] In view of all these circumstances, it is inconceivable to us that the district court would credit Fike's and Ellison's denials and override all of the persuasive contrary evidence. This is one of those cases in which the result appears "obvious." *Bogart*, 783 F.2d at 1434. Accordingly, even assuming the *Bogart* approach to the resolution of factual matters to be correct, we do not think a remand for factual findings by the district court is required in this instance.

Ellison and Fike rely primarily on our decision in *United States v. Greene*, 454

F.2d 783 (9th Cir.1971). In that case an undercover agent who had provided information that led to a previous arrest of defendants on bootlegging charges reestablished contact with the defendants while those charges were pending. For the next two-and-one-half years the agent was extensively involved in the defendants' illegal operations. He offered to provide a distilling site, equipment, and manpower, and did provide 2000 pounds of sugar to be used in the distilling process. Of critical importance, the government was the operation's sole customer. We concluded that the government's extensive involvement in "the creation and maintenance of [the] criminal operation[ ]" precluded prosecution of the defendants. *Id.* at 787. However, *Greene* is distinguishable from the present case. Here, Gavitt established contact with Ellison and Fike on the basis of their continuing illegal conduct. Gavitt was not the defendants' only customer. Ellison maintained an ongoing operation, selling to such clients as Morris Nielson and K.L. Kim, even when not dealing with Gavitt, and Fike spoke several times of other clients of his own.[8]

 Because Ellison and Fike, during the period when they committed the acts at issue here, were actively engaged in other similar criminal activity, we conclude that the outrageous government conduct defense is unavailable. But for the evidence of that additional unlawful activity we might well have reached a different result. The killing of wildlife, on more than one occasion, by an FWS agent raises significant questions as to the extent to which government agents may commit serious

---

**7.** Although the jury deadlocked on two counts involving Ellison, their failure to convict him on those counts does not affect our analysis.

**8.** Ellison and Fike also rely on *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), where the court accepted the defendant's due process defense based on outrageous government conduct. In that case, however, the government informant provided equipment, hard-to-obtain essential chemicals, a site, and expertise for the production of

speed. The informant was in charge of the laboratory, and the defendant's involvement was minimal and at the direction of the informant. The court concluded that the government had "generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs." *Id.* at 381. Thus, *Twigg* is distinguishable for the same reasons as *Greene*.

crimes in order to prevent others from committing similar offenses. Here, the government agent was not a passive participant or simply a purchaser or transmitter of contraband otherwise destined for the market place. To the contrary, he himself was the perpetrator of the most serious offenses involved—the actual killing of protected wildlife. Under different circumstances such active criminal behavior by a government agent might well result in our upholding a defense of outrageous government conduct.[9]

### III. ENTRAPMENT

#### A. *Change in Instruction*

Fike contends that the district court added the following sentence to its entrapment instruction after he had given his closing argument but before the prosecution's rebuttal: "The entrapment defense is available only to defendants who were directly induced by government agents." There is no doubt, and Fike does not contend otherwise, that this statement accurately reflects the law in this circuit that a defendant may not rely on "secondary or derivative entrapment." *See United States v. North*, 746 F.2d 627, 630–31 (9th Cir.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985); *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1339 (9th Cir.1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). Fike argues, however, that he was prejudiced by the change in instruction because it occurred after he had already presented his theory of the case to the jury.

■ Following the district court's charge to the jury, both parties were given an opportunity to object on the record to any of the instructions given. Fike objected to the entrapment instruction itself, but did not object to the timing of the change. We generally will not consider an argument raised for the first time on appeal. *E.g.,*

*United States v. Whitten*, 706 F.2d 1000, 1012 (9th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). Moreover, Fike contends that he never sought to rely on the defense of secondary entrapment. Rather, it was his position that Ellison was a government agent. Therefore, even assuming the change in instruction occurred following his closing argument to the jury, we fail to see how he was prejudiced by the addition of a statement that did not in any way contradict his theory of the case.

■ Fike also argues that the court should not have included the instruction on secondary entrapment without including an additional instruction regarding agency. He did not, however, request the judge to include such an instruction even after he was notified that the judge was including the secondary entrapment instruction. In addition, any instruction the court might have given as to what makes a person a government agent would, under the facts of this case, have excluded Ellison; consequently, Fike would have been worse off had an agency instruction been given. Thus, he suffered no prejudice.

#### B. *Sufficiency of the Evidence*

■ The entrapment defense focuses on whether the defendant was predisposed to commit the crime with which he is charged. *See, e.g., United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973); *United States v. Marcello*, 731 F.2d 1354, 1357 (9th Cir.1984). Fike contends the government failed to produce sufficient evidence to prove predisposition beyond a reasonable doubt. Fike did not, however, raise this issue before the district court. As a general rule we will not consider an argument presented for the first time on appeal. *E.g., United States v. Whitten*, 706 F.2d 1000, 1012 (9th Cir.1983),

---

**9.** In *United States v. Sanford*, 547 F.2d 1085 (9th Cir.1976), we suggested, with very little discussion or analysis, that we would reach a different result. *Id.* at 1090 n. 8. However, we assume that the *Sanford* statement

was dictum. It seems most unlikely that had we intended to set forth a holding of such significance, we would have done so in a footnote and failed even to mention the issue in the text.

*cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984).

 In addition, the existence of entrapment is ordinarily a question of fact for the jury, *see, e.g., Marcello,* 731 F.2d at 1357, and we will not disturb the jury's finding unless, viewing the evidence in the light most favorable to the government, no reasonable jury could have concluded that Fike was predisposed to commit the charged offenses, *see, e.g., Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979).[10] Our review of the record indicates the government submitted ample evidence showing such predisposition. We have described several factors that may be considered when determining predisposition, *see, e.g., United States v. Diggs,* 649 F.2d 731, 737 (9th Cir.), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981), the most important of which is whether the defendant showed any reluctance, *see, e.g., So,* 755 F.2d at 1354; *United States v. Reynoso-Ulloa,* 548 F.2d 1329, 1336 & n. 11 (9th Cir.1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). From his first meeting with Gavitt, Fike seemed eager to work with him, often bragging about the extent of his illegal activities in order to impress him. There also was little doubt that Fike engaged in the criminal activities for profit, another factor we have recognized as relevant to predisposition. *See, e.g., Diggs,* 649 F.2d at 739. Finally, the government introduced evidence that in 1978 and 1979 Fike was convicted of or pleaded guilty to various violations of wildlife laws. Evidence of prior criminal acts, although generally inadmissible to show propensity, is admissible to show predisposition where the defense of entrapment is raised. *E.g., id.* at 737.

Fike's principle argument is that he was in dire financial straits and was induced to commit the charged offenses by the large sums of money Gavitt was offering. We

have made clear that, harsh though the rule may be, an individual "cannot claim he was entrapped simply because he was poor and could not resist the substantial sums of money to be made." *United States v. Dion,* 762 F.2d 674, 689 (8th Cir.1985). Given the substantial evidence in the record of Fike's predisposition, the jury could properly conclude that Fike was not entrapped.

## IV. MARKET VALUE REQUIREMENT

Fike was convicted of three felony violations of the Lacey Act. The provision under which these convictions were obtained requires the government to prove, *inter alia,* that a defendant knowingly engaged in conduct involving the sale of wildlife "with a market value in excess of $350." 16 U.S.C. § 3373(d)(1)(B). If the value of the wildlife sold is $350 or less, the offense is a misdemeanor. *See* 16 U.S.C. 3373(d)(2).

### A. *Jury Instructions*

The district court instructed the jury that:

> The market value of wildlife may be established by several methods.
>
> One method is, of course, the price a piece of property would bring if sold on the open market between a willing buyer and seller.
>
> Another method to establish market value is the price paid for guiding services for the hunt in which the wildlife was taken.
>
> Either of the above methods is a proper method to use in determining market value.

The court rejected, over Fike's objection, the following instruction proposed by one of Fike's co-defendants:

> The market value of wildlife may be established by the same method used to

---

**10.** We have stated that "there may be instances where the undisputed facts establish the entrapment defense as a matter of law ... or where the evidence is simply insufficient to submit the issue to the jury." *United States*

*v. Marcello,* 731 F.2d 1354, 1357 (9th Cir. 1984) (citations omitted). As our discussion makes clear, this case falls into neither category.

determine the market value of other types of property, that is,

The price at which a seller is ready and willing to sell and a buyer ready and willing to buy in the ordinary course of business.

The price paid by an undercover agent for a piece of property is not conclusive proof of the market value of that piece of property.

Fike contends the court's instruction failed to provide an appropriate standard for assessing the market value of the wildlife. He argues the government should be required to provide objective evidence to establish the market value of the wildlife "in the ordinary course of business." The court's instruction, he contends, allows the government to establish market value merely by relying on the price the government agent paid for the wildlife. This, in turn, the argument continues, permits the government, simply by making an offer of more than $350, to create a felony violation where the true market value is less than $350.

Whether a jury instruction was proper is a question of law, which we review *de novo*. *E.g., United States v. North,* 746 F.2d 627, 629 (9th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985). However, the judge "is given substantial latitude in tailoring the instructions," and we will not find reversible error as long as the instructions, when viewed as a whole and in the context of the entire trial, "fairly and adequately cover the issues in the case." *United States v. Mirabelles,* 724 F.2d 1374, 1382–83 (9th Cir. 1984). Where a challenge is merely to the language of the instructions, we reverse only if the court abused its discretion. *E.g., id.* at 1383.

Because we reverse Fike's conviction on the only count on which evidence was introduced as to "the price paid for guiding services," *infra* section VI, we need not consider the third paragraph of the court's instruction. The second paragraph of the instruction, which governed the deliberations on all other counts, required the jury

to determine the price the wildlife would bring "if sold on the open market between a willing buyer and seller." This formulation corresponds to a typical definition of "market value." *See, e.g.,* 55 C.J.S. *Market* at 789–97 (1948) (citing cases); Black's Law Dictionary 1123 (4th ed. rev. 1975). Fike points to nothing in either the Lacey Act or its legislative history suggesting that his proposed "in the ordinary course of business" modification is required.

■ The essence of Fike's argument is that the court's instruction provides the government the opportunity to determine conclusively the market value of the wildlife sold. We agree with Fike that the government should not be given absolute discretion to convert any violation of the Act into a felony by offering a defendant an excessively high price for the contraband. Indeed, we think it would be advisable for district courts to instruct juries considering Lacey Act felony charges that, as Fike suggests, the price paid by a government agent is not conclusive evidence of market value. Nevertheless, the second paragraph of the instruction, the part that is applicable here, does not suggest in any way that the price paid by a government agent is conclusive. To the contrary, that part of the instruction left Fike free to argue, as he did, that the prices paid by Gavitt were not a proper measure of that market value.

## B. *Sufficiency of the Evidence*

■ Fike also contends the government presented insufficient evidence to establish that the market value of the wildlife was greater than $350. The question of market value is a factual one for the jury. Because we reverse Fike's conviction on the count relating to his provision of guiding services, *see* section VI *infra,* we do not address the sufficiency of the evidence of the market value on that count. As to the two remaining transactions for which a felony charge was brought—both of which involved mountain lions—according to Fike's own testimony, he initially stated a price, Gavitt responded with a lower offer,

and an agreement was eventually reached on a price lower than the one Fike had originally requested. In both cases the price paid was well above $350. That fact may certainly be considered by the jury. More important, however, the government introduced evidence in its rebuttal that mountain lion skins sold at a state auction for prices ranging up to $750. The jury was presented with sufficient evidence from which to conclude that the wildlife involved in Fike's two remaining felony charges had a market value in excess of $350.

### C. *Vagueness*

Fike next contends that the Lacey Act's felony provision is unconstitutionally vague as applied to him because it gives the government unlimited discretion to create a felony violation by offering to pay more than $350 for wildlife. This argument is essentially the same one discussed in part A *supra,* and the reasons we rejected it there apply here as well.

 A law is impermissibly vague when it fails to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly" or "when it fails to apply explicit standards for those who apply [it] ... with the attendant dangers of arbitrary and discriminatory applications." *Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 227 (1972)). The Lacey Act clearly notifies individuals that participation in prohibited transactions involving wildlife with a market value greater than $350 subjects them to felony prosecution. Accordingly, the market value requirement in the Lacey Act is not unconstitutionally vague.

### V. CROSS-EXAMINATION

Fike contests the district court's decisions to permit cross-examination of him regarding his divorce and to prohibit certain cross-examination of Gavitt. A district court's ruling on the permissible extent of cross-examination is reviewed for an abuse of discretion. *E.g., United States v. Kennedy,* 714 F.2d 968, 973 (9th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984).

### A. *Cross-examination of Fike*

 A defendant who elects to take the stand subjects himself to cross-examination on any matters reasonably related to the subject matter of his direct examination, and the trial judge has broad discretion to determine the bounds of such questioning. *United States v. Panza,* 612 F.2d 432, 436–37 (9th Cir.1979), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980). When entrapment is raised as a defense, the defendant is exposed to "a searching inquiry into his own conduct and predisposition." *United States v. Reynoso-Ulloa,* 548 F.2d 1329, 1341 (9th Cir.1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978); *see United States v. Diggs,* 649 F.2d 731, 737 (9th Cir.) *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981).

 Fike's defense at trial was entrapment. He testified on direct examination that when he first came into contact with Gavitt he was experiencing serious financial problems, that these problems eventually led to his divorce, and that his children were not permitted to live with him. On cross-examination, the district court allowed the government to question Fike about judicial findings in the divorce decree regarding the reasons for the divorce and for the decision to award custody of the children to Fike's ex-wife. Because these matters were reasonably related to Fike's direct testimony, the district court did not abuse its discretion in allowing this questioning.

### B. *Cross-examination of Gavitt*

The district court permitted Fike extensive cross-examination of Gavitt concerning Operation Trophykill and the individuals contacted, including Ellison, but sustained the government's objections to some ques-

tions, in particular those regarding the charges filed against Ellison. Because these questions either were irrelevant or involved hearsay, the court did not abuse its discretion in prohibiting them.

## VI. GUIDING SERVICES

Stenberg was charged with "selling in interstate commerce, wildlife, to wit: one (1) bull elk" in violation of the Lacey Act, 16 U.S.C. § 3372(a)(2)(A), and with aiding and abetting such a violation by Ellison and Amundsen, *see* 18 U.S.C. § 2 (1982). Stenberg argues that neither his alleged sale of a license for hunting wildlife nor Ellison's and Amundsen's sale of guiding services for such a hunt violated the Act's prohibition against "selling wildlife." The government has agreed that the only issue presented in Stenberg's case is whether the sale either of a hunting license or of guiding services constitutes a "sale of wildlife" for purposes of the Lacey Act. It argues that the sale of a license or of guiding services is specifically covered by the Act. Under its theory, an offer of such a sale would violate the Act, even if no hunt ever took place, because it would constitute an offer to sell wildlife; and an actual sale of a license or of guiding services would violate the Act even if no wildlife were killed, because it would constitute an attempt to sell wildlife. Finally, if the hunt were successful, the sale of the license or the guiding services would constitute a sale of the prey.

One of the oldest and most settled rules of statutory construction is the principle that criminal laws are to be construed strictly. *See, e.g., Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980); *United States v. Boston and Maine R.,* 380 U.S. 157, 160, 85 S.Ct. 868, 870, 13 L.Ed.2d 728 (1965) (rule " 'is, perhaps, not much less old than construction itself' ") (quoting *United States v. Wiltberger,* 18 U.S. 76, 5 Wheat. 76, 95, 5 L.Ed. 37 (1820)); *United States v. Varbel,* 780 F.2d 758, 760 (9th Cir.1986). Under our system of government, which is designed to foster individual liberty and re-

strict the arbitrary exertion of governmental authority, a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *see, e.g., Great American Houseboat Co. v. United States,* 780 F.2d 741, 746 (9th Cir.1986). "[N]o individual [may] be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. United States,* 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979); *see, e.g., United States v. Mussry,* 726 F.2d 1448, 1454 (9th Cir.1984). Any statutory provision which does not give "fair notice as to what constitutes illegal conduct so that [an individual] may conform his conduct to the requirements of the law," *United States v. Dahlstrom,* 713 F.2d 1423, 1427 (9th Cir. 1983), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984), "violates the first essential of due process of law." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See, e.g., Bouie v. City of Columbia,* 378 U.S. 347, 363, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); *Varbel,* 780 F.2d at 762.

Section 3 of the Lacey Act Amendments of 1981 provides that it is "unlawful for any person ... to import, export, transport, *sell,* receive, acquire, or purchase" in interstate commerce wildlife obtained in violation of state law. 16 U.S.C. § 3372(a)(2)(A) (emphasis added). Section 4 prescribes penalties for anyone who violates the Act by "knowingly engaging in conduct that involves the sale ... of, the offer of sale ... of, or the intent to sell ... wildlife." 16 U.S.C. § 3373(d).

A common definition of the word "sell" is that it means the act of "giv[ing] up (property) to another for money or other valuable consideration." *Webster's Third New International Dictionary (Unabridged)* 2061 (1976). This common understanding contemplates the transfer of

something that is possessed by, or is otherwise in the control of, the seller. An ordinary person, therefore, would understand "sale of wildlife" to mean a conveyance to a buyer for valuable consideration of wildlife possessed or otherwise controlled by the seller. We do not believe an ordinary person would consider the sale of guiding services or a hunting permit to be a sale of wildlife. These acts would be viewed as providing the buyer the opportunity to kill wildlife, but they would not be considered as an actual sale of the wildlife itself. At the very least, one would have to speculate whether such conduct falls within the prohibition on "selling wildlife." Such uncertainty in meaning cannot be tolerated in a criminal provision.

The government relies primarily on the Senate Report on the Lacey Act for its argument that the provision of guiding services or a hunting license constitutes the "sale of wildlife" for purposes of the Act. That Report states:

The "commercial activity" portion of Section 4(d)(1) does not encompass the dealings of a hunter with his taxidermist. Such dealings clearly do not constitute a sale or purchase of wildlife. Similarly, the dealings of a hunter with his travel agent or an airlines [sic] to arrange a trip for the acquisition of wildlife clearly does not constitute a sale or purchase of wildlife. However, a commercial arrangement whereby a professional guide offers his services to illegally obtain wildlife is, in effect, an offer to sell wildlife. When such an offer is made with the requisite knowledge of the illegal nature of the act, Section 4(d)(1) will apply. As with Section 4(d)(2), the Act's criminal culpability requirement assures that innocent violators of the Act will not be subject to criminal penalties.

S. Rept. No. 123, 97th Cong., 1st Sess. 12, reprinted in 1981 U.S.Code Cong. & Admin.News at 1748, 1759. Legislative history may not, however, be used to bring within a criminal statute conduct that is not clearly encompassed within the ordinary meaning of the provision. Cf. e.g., Aronsen v. Crown Zellerbach, 662 F.2d 584, 588

n. 7 (9th Cir.1981) ("we are not free to substitute legislative history for the language of the statute"), cert. denied, 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431 (1983). As we explained supra, "one 'is not to be subjected to a penalty unless the words of the statute plainly impose it.'" United States v. Campos-Serrano, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971) (quoting Keppel v. Tiffin Savings Bank, 197 U.S. 356, 362, 25 S.Ct. 443, 445, 49 L.Ed. 790 (1905) (emphasis added). A person is not required to look beyond the face of a statute and research its legislative history in order to determine whether acts not within the statute's language are nevertheless prohibited.

We acknowledge that the Lacey Act's goal of protecting wildlife may be as threatened where an individual provides guide services or a hunting license as where the individual actually kills wildlife. However, "[t]he fact that a particular activity may be within the same general classification and policy of those covered does not necessarily bring it within the ambit of the criminal prohibition." Boston and Maine R., 380 U.S. at 160, 85 S.Ct. at 870. If Congress intends to prohibit the sale of hunting licenses or professional guide services, it must do so "'plainly and unmistakably.'" United States v. Bass, 404 U.S. 336, 348, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971) (quoting United States v. Gradwell, 243 U.S. 476, 485, 37 S.Ct. 407, 410, 61 L.Ed. 857 (1917)).

We recognize that the Fifth Circuit has stated, in United States v. Todd, 735 F.2d 146 (5th Cir.1984), that the provision of professional guiding services constitutes an offer to sell wildlife under the Lacey Act. Id. at 152. However, the court made its statement without any analysis whatsoever. It did not discuss either the language of the Act or the established rule that criminal provisions are to be construed narrowly; it merely cited the Senate Report quoted supra. The court's cursory treatment of the guiding services issue may be due to the fact that, as far as one can tell from the opinion, the issue whether such

services are covered by the Act was not even raised by the parties. The court made its conclusory statement in a discussion of the Act's market value requirement. In any event, based on the language of the Lacey Act and the strictness with which criminal prohibitions are to be construed, we must respectfully disagree with the statement contained in *Todd*.

We hold that the Lacey Act's prohibition of the "sale of wildlife" does not apply to the sale of guiding services or hunting permits. The statute simply does not cover such conduct. To construe the Act as the government suggests would violate the constitutional guarantee of due process. Accordingly, we vacate Stenberg's conviction and reverse the district court's denial of his motion to strike. We remand so that Stenberg may withdraw his plea of guilty in accordance with Rule 11(a)(2) and the district court may strike the indictment as to him.

Although Fike was also convicted of one count of providing guiding services in violation of the Lacey Act's prohibition on the sale of wildlife, unlike Stenberg he failed to raise the issue in both the district court and on appeal. Nevertheless, the question was fully briefed and argued by Stenberg and by the government. We asked the parties for supplemental memoranda regarding the proper course of action for the court to take under such circumstances. In its response, the government stated forthrightly, "If ... the court concludes that the provision of guiding services cannot under any circumstances constitute a sale of wildlife because Congress did not speak with sufficient clarity to prohibit such conduct, a more fundamental problem is presented ... [A] miscarriage of justice might result if Fike's conviction on Count II were not reversed." In the conclusion to its memorandum the government said, "If ... the Court concludes that Congress did not speak with sufficient clarity to proscribe such conduct, then fairness would dictate that Fike's conviction on Count II should also be reversed." The government expressed these views after carefully analyz-

ing the plain error doctrine and Fed.R. Crim.P. 52(b). In light of the government's response—one with which we strongly agree—and given our holding that the provision of guiding services does not constitute the sale of wildlife for purposes of the Act, and that it would be a violation of due process to so construe the Act, we hold that the interests of fairness and justice dictate that we vacate Fike's conviction on the guiding services count *sua sponte*.

## VII. CONCLUSION

We hold, in light of the evidence of Ellison's and Fike's ongoing violations of wildlife laws, that the outrageous government conduct defense is unavailable to them. Accordingly, we affirm Ellison's conviction. With respect to Fike's appeal, we further hold that: There was sufficient evidence for the jury to find that he was not entrapped and that the Lacey Act's market value requirement was met; the court did not commit reversible error by changing its entrapment instruction following Fike's final statement to the jury; the part of the court's jury instruction regarding the market value requirement that we review here was proper; the felony provision of the Act is not unconstitutionally vague as applied to Fike; and the court did not abuse its discretion by its rulings regarding the scope of cross-examination. Finally, we hold that the provision of guiding services or a hunting permit does not constitute the sale of wildlife for purposes of the Lacey Act. Accordingly, we reverse Stenberg's conviction and remand so that he may withdraw his conditional plea of guilty and the district court may strike the indictment as to him; we also reverse Fike's conviction on Count II, the charge relating to the provision of guiding services, and vacate his sentence on that count.

Affirmed as to Ellison. Affirmed in part and reversed and vacated in part as to Fike. Reversed and remanded as to Stenberg, for further proceedings not inconsistent with this opinion.