**UNITED STATES of America, Plaintiff,**

v.

**Harpal Singh AHLUWALIA, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Narinder Pal MAHAL, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Dalip Singh GHOTRA, Defendant.**

**Nos. CR–90–20126–RMW (PVT), CR–90–20139–RMW (PVT) and CR–90–20124–RMW (PVT).**

United States District Court,
N.D. California.

Nov. 4, 1992.

Marcia Jensen, Asst. U.S. Atty., San Jose, CA, for plaintiff.

Robert Wagoner, Tamburello, Hanlon & Wagoner, San Francisco, CA, Mike A. Karagozian, Fresno, CA, Stuart D. Kirchick, Siner, Steinbock, Hofmann & Pennypacker, San Jose, CA, for defendants.

ORDER REJECTING MAGISTRATE JUDGE'S RECOMMENDATION RE: MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT AND DENYING MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT

WHYTE, District Judge.

I. Introduction

On May 20, 1992, Magistrate Judge Trumbull issued a report and recommendation regarding defendants' motion to dismiss their indictments for outrageous governmental conduct. Judge Trumbull found that, given the totality of the circumstances, the government's conduct was "outrageous" and recommended that certain counts charged against all three defendants be dismissed. Nine days after Judge Trumbull issued her order, the government filed objections thereto pursuant to 28 U.S.C. § 636(b). The government posed its objections because it believes that (i) the report and recommendation mischaracterized and misapplied the law, and (ii) that the factual conclusions in the report and recommendation were unsupported by and inconsistent with the record. All three defendants oppose the government's objections to the magistrate judge's order. For the reasons set forth below, the court hereby rejects the recommendation of the magistrate judge, and denies defendants' motion to dismiss the indictments for outrageous governmental conduct.

II. Standard of Review

28 U.S.C. § 636(b) provides for the district court's *de novo* review of those portions of a magistrate judge's report and recommendation to which a party has objected. In *Orand v. United States*, the Ninth Circuit set forth the following procedures for such a review:

If neither party contests the magistrate's proposed findings of fact, the court may assume their correctness and decide the motion on the applicable law.

The district court, on application, shall listen to the tape recording [or read the transcript] of the evidence and proceedings before the magistrate and consider the magistrate's proposed findings of fact and conclusions of law. The court shall make a de novo determination of the facts and the legal conclusions to be drawn therefrom.

\*   \*   \*   \*   \*   \*

Finally, the court may accept, reject or modify the proposed findings or may enter new findings. It shall make the final determination of the facts and the final

adjudication of the motion to [dismiss for outrageous government conduct].

602 F.2d 207, 208 (9th Cir.1979), quoting *Campbell v. United States District Court,* 501 F.2d 196, 206–07 (9th Cir.), *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974); *accord United States v. Remsing,* 874 F.2d 614, 617 (9th Cir.1989).

In this case, the court has reviewed not only the report and recommendation of the magistrate judge, but also the transcripts from the evidentiary hearings before the magistrate judge, the relevant grand jury transcripts, and the parties' briefs that present and oppose the objections to the report and recommendation. The court has made a *de novo* determination of the matters to which objections were posed. The court's findings of fact and application of the law to those facts are set forth below.

## III. Facts

In November of 1990, a grand jury indicted defendants Ahluwalia, Mahal, and Ghotra, charging them with one or more counts of conspiracy and bribery of a public official. The indictments charged that defendants bribed Gregory Ward, the Chief Legalization Officer at the Salinas office of the Immigration and Naturalization Service (INS), to obtain Temporary Work Authorization Cards (INS Form I688–A).

In 1990, these work authorization cards were available to certain eligible immigrants as a result of an INS Amnesty Program. Although the time for filing for legalization under the Amnesty Program had expired, the courts in litigation brought by Catholic Social Services and the League of United Latin American Citizens ordered the time for filing to be reopened to provide an opportunity for those eligible immigrants who were out of the country during the prior filing periods to file for work authorizations. The Salinas office was one of the few offices that remained open to accommodate the court order. To receive a card, eligible immigrants were required to complete a written questionnaire, be interviewed by an INS official, and be photographed.

In early June of 1990, the Federal Bureau of Investigations (FBI) was apprised by INS officials that Gregory Ward had been offered a bribe in exchange for work authorization cards. As a result, on June 11, 1990, FBI Agent Richard Lack met with Ward to discuss the details of the solicitation. Ward told Lack that he had been solicited on the previous day, June 10, and that he had arranged a follow up meeting with the bribers on June 12. Ward told Lack that he had been solicited by two East Indians, Dalip Ghotra and Om Sondhi. During that meeting, Ward agreed to participate with the FBI, which wanted to investigate the alleged bribery attempts, by secretly recording conversations with these and other alleged bribers.

Initially, the focus of the bribery investigation was on Ghotra and Sondhi. Ward began to wear a body wire to meetings with them and record their conversations. Agent Lack personally wired and unwired Ward for these prearranged meetings. Early on in the investigation, almost all of the meetings between Ward and the bribers were recorded. Between June and September of 1990, there were at least ten to twelve undercover meetings with Ghotra and Sondhi.[1]

In July, two other men, known as the Wahlia brother, approached Ward to purchase work permits. The Wahlia brothers offered Ward $1,000.00 per card (double the price that Ghotra and Sondhi were paying). When Ward informed Agent Lack and Special Assistant United States Attorney (AUSA) Linda Mitlyng of these solicitations, Lack and Mitlyng decided not to include these new bribers in the investigation, apparently in an attempt to control its scope. Ward, nonetheless, began to give the Wahlia brothers the work authorization cards (supposedly without charge) that they sought. Ward indicated that he gave them the cards since he believed they would not take "no" for an answer.

After Ward informed Lack that he had given work permits to the Wahlias', the FBI included the Wahlia brothers in the

---

**1.** Generally, during these meetings the alleged bribers would give Ward envelopes of money in exchange for the work authorization cards. The bribers were usually seeking to obtain cards for others, effectively serving as brokers.

investigation. Ward was thus directed to accept bribes from the Wahlias'. In part, the FBI let the Wahlia brothers bribe Ward because they did not want to jeopardize the investigation. They feared that, if rejected, the Wahlia brothers might complain about the bribes that Ward was accepting from others and expose the sting operation. The FBI felt it important at that point to continue the investigation to find out who was "calling the shots," RT 65, at the "peak of the pyramid...." RT 65.

By September 24, 1990, Ward had accepted bribes in the amount of approximately $100,000.00. This bribe money came from Sondhi, Ghotra, the Wahlias' and a Mr. Rami, an associate of Ghotra's who appears to have been only tangentially involved.[2] In addition, by this time Ward had issued about 200 work authorization cards. These cards were primarily issued to East Indian, Punjabi and Sikh immigrants.

Sometimes, Ward accepted the bribes inside the INS office in Salinas. He took other bribes outside the office and across the INS parking lot in a cemetery, where the FBI could more easily observe the meetings between Ward and the bribers. The testimony is unclear whether third parties could observe the bribing of Ward outside of the INS office. In any event, the word got out that work permits were for sale at the Salinas office of the INS. The client population of the Salinas office changed accordingly. Agent Lack noticed that "all of a sudden" the Salinas office, which once handled mainly Hispanic immigrants, was handling "almost exclusively East Indians." RT 76.

In September of 1990, the FBI decided to expand the investigation again for a period of time to include "all comers."[3] RT 101. The FBI instructed Ward that on September 24, 1990, he should accept bribes from everyone who offered them. Three days later, the FBI abandoned this idea and restricted the scope of the investigation again. The FBI was forced to do so because it was getting too much bribe money and receiving too many files to handle. In the four day period from September 24 through 27, Ward accepted bribes on behalf of hundreds of immigrants. RT 114. He accepted thousands of dollars in bribe money from approximately a dozen additional people. RT 112. Ahluwalia and Mahal were among those dozen people.

By early October, Agent Lack and AUSA Mitlyng became convinced that there was no single unified conspiracy among the bribers to solicit Ward in exchange for work authorization cards. Several weeks thereafter, the FBI began doing the work necessary to conclude the investigation. The investigation culminated with the arrest on October 31, 1990 of twelve persons, with warrants outstanding for ten more.

There is no question that there were problems with the FBI sting operation. At times, it appears that the operation was getting so large that the FBI could not control it. Indeed, over the course of the four-month investigation, Ward received more than a million dollars in bribe money and approximately 1300 applications for work permits. Money was accepted which, today, cannot be tied to particular applications. Cards were issued for which no accurate accounting was made. Ward met with and accepted money from bribers without authorization from the FBI. Many of the meetings with the bribers went unsupervised and unrecorded. Surprisingly, to date, the FBI does not know whether it was accepting bribe money on behalf of people who were otherwise eligible to receive the work authorization cards. RT 96.

In addition, throughout this investigation, Ward had a great deal of discretion in deciding to whom he issued work authorization cards.[4] He also had a great deal of

---

**2.** From June 11 to September 24, 1990, several other people approached Ward trying to "feel him out" about bribes. RT 77. Some people even approached Ward in San Francisco while he was there on temporary assignment about purchasing work authorization cards.

**3.** The FBI had previously sought to limit the investigation by a variety of means, including

limiting it to specific alleged bribers, increasing the "price" of each work permit, and instructing Ward to turn away any new people who attempted to solicit him.

**4.** In the capacity as head of the Salinas INS office, Ward had the authority to issue work authorization cards without being supervised or scrutinized. There were as many as fifteen staff

discretion in deciding from whom to take money. Ironically, he refused to take money from people whom he did not like, thereby keeping those people outside of the scope of the investigation.

The FBI gave Ward relatively free rein in connection with the investigation. Moreover, Ward did not always adhere to the FBI's directions regarding how to conduct the investigation. Ward appears to have been unable on numerous occasions to turn away those who were attempting to solicit him. Near the end of the investigation, Ward would refer new people who approached him wanting to buy cards to the "known brokers." He did this presumably because he had been directed by the FBI to refuse to accept bribe money from new people.

The record reflects that by late September of 1990, there were approximately 500 to 600 East Indians in or about the Salinas office "trying to figure out how they could get a card." RT 108. It was not unusual for immigrants to line up begging Ward to obtain their cards. RT 106. In addition to the fact that the immigrants, in some cases, were desperate for cards, there is evidence in the record that bribery is "a fact of life in India. If you want something done by the government, you have to fork over some cash." Grand Jury Transcript (GJT) 40.

The hoard scene at the Salinas INS office became the subject of media coverage, as well as complaints to local politicians and congressmen. Local law enforcement and the INS in San Francisco received complaints. Agent Lack himself received "anonymous phone calls from Indians all over the Bay Area telling [him] Greg Ward was taking bribe money. And [he] had to act stupid ... [he] didn't want to tell them, 'yeah, it is because of my design over this.'" GJT 37; RT 117.

Finally, it is unclear from the evidence whether during the period of the investigation, temporary work permits remained available at the Salinas Immigration Office to eligible applicants at the normal process-

ing periods. Ward suggested in his testimony that the application process remained the same from June through September 1990, with the office conducting approximately twenty interviews per day. RT 295–99. Harvinder Singh, however, testified that he was unable to procure legally a work permit for his brother, who may have been eligible under the Amnesty Program. RT 445–60. Singh testified that, in his experience, the office accepted very few legal applications—on some days, the office accepted approximately five applications, on other days, the office accepted none. During this same time period, Singh observed Ramesh Birla, one of the alleged bribers, hand in applications and obtain work permits for immigrants within a matter of hours.

### IV. Law on Outrageous Governmental Conduct

The *outrageous government conduct* defense is based upon violations of the Due Process Clause of the Fifth Amendment to the United States Constitution. *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). The Supreme Court in *Russell* commented in dicta that, although the outrageous government conduct defense did not apply in that case, the court

> may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction....

411 U.S. at 431–32, 93 S.Ct. at 1643 (citation omitted).

### A. *Courts that Have Applied the Defense*

Since *Russell*, many courts have discussed this defense, but few have applied it to their facts. Only three federal appellate courts have reversed convictions on the basis of outrageous governmental conduct—*Greene v. United States*, 454 F.2d 783 (9th Cir.1971), *United States v. West*, 511 F.2d 1083 (3rd Cir.1975), and *United*

---

members in the Salinas office, though not all of them were present at any given time. Ward had the authority to overrule any decision made by

staff concerning the issuance of work authorization cards and to mandate the issuance of cards.

*States v. Twigg,* 588 F.2d 373 (3rd Cir. 1978). In the Northern District of California, only two courts have applied the outrageous government conduct defense—*United States v. Batres–Santolino,* 521 F.Supp. 744 (N.D.Cal.1981), and *United States v. Marshank,* 777 F.Supp. 1507 (N.D.Cal. 1991). Thus, it appears that the successful assertion of the outrageous government conduct defense is extremely rare.

The relevant facts of the foregoing cases are as follows:

In *Greene,* an undercover agent who had previously assisted in catching and convicting two bootleggers renewed his investigation of them as soon as they were released from jail. The agent not only provided defendants with the necessary sugar to manufacture the alcohol, but also located a site for the still and offered to provide a still operator. In addition, for over two years, the agent was the only customer of the illegal operation that he helped to create. The defendants were tried and convicted of the illegal manufacture of alcohol. In reversing these convictions, the Ninth Circuit explained that:

> when the government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative.

*Greene,* 454 F.2d at 787.

In *West,* the Third Circuit reversed a defendant's conviction for the unlawful distribution of heroin. As in *Greene,* the governments' own agents set up the accused in the illicit activity by supplying him with narcotics and then introducing him to another government agent as a prospective buyer. The court refused to condone what it saw as activity that put law enforcement authorities in the position of creating new crimes for the sake of bringing charges against a person that they had persuaded to participate in the wrongdoing. *West,* 511 F.2d at 1085.

In *Twigg,* Drug Enforcement Administration agents enlisted the aid of a convicted drug manufacturer to act as an informant to apprehend other drug traffickers. The agents provided the informant with chemical ingredients, glassware and a laboratory site. The informant then took charge of the drug manufacture and furnished all of the drug-making expertise. Neither of the defendants, who were convicted at the trial level, knew how to manufacture the drugs on their own. The Third Circuit reversed the convictions because it found that the government not only supplied the necessary ingredients for the manufacture of the methamphetamine, but also created and contrived the very crime it sought to prosecute.

*Batres–Santolino* also involved drug trafficking. Defendants were indicted with conspiracy to import and possess cocaine with intent to distribute. The court dismissed the indictments, however, holding that although defendants, novices in the field, were not without some culpability, they were not embarked or about to embark in any criminal activity until the government's agent set in motion an operation to import cocaine.

In *Marshank,* the court also dismissed the indictment after it determined that the government had knowingly allowed, encouraged and rewarded an unethical lawyer who violated his clients' confidences and acted in a manner clearly in conflict with his clients' best interests to facilitate prosecutions of his own clients.

In the case at hand, the magistrate judge found in her report and recommendation that none of the facts in any of the above-described cases (except *West,* which she did not discuss) could be "adequately compared with the facts in the instant bribery case for the purposes of determining outrageous conduct." Report and Recommendation (R/R) at 10–11. This court agrees that the facts in this case are different from those where the outrageous conduct defense was applied. It finds, however, that the analysis used and principles applied in those cases and others require this court to conclude that the defense does not apply here.

**B.** *Principles for Analysis of the Government's Conduct*

The outrageous government conduct defense admittedly involves a difficult area of

the law. As the Ninth Circuit in *United States v. Bogart,* commented:

> [d]rawing a bright line [which sets forth when the defense applies and when it does not] with any degree of assurance is fraught with problems. The point of division at the margins between police conduct that is just acceptable and that which goes a fraction too far probably cannot be usefully defined in the abstract. Ultimately, every case must be resolved on its own particular facts.

783 F.2d 1428, 1428 (9th Cir.1986). *Bogart* goes on to explain that outrageous government conduct turns on the individual case facts and a totality of the circumstances. When these circumstances are such that law enforcement conduct is so outrageous that it "shocks the conscience," the government's actions are considered to be constitutionally unacceptable. *Id.*

*Bogart,* nonetheless, goes on to describe particular government conduct that is not considered by the courts to meet the standard of "outrageous." This conduct includes: using artifice and stratagem to ferret out criminal activity, using and paying for government informants, supplying contraband to gain the defendants' confidence, providing necessary and valuable items to further an existing conspiracy, infiltrating a criminal organization, and approaching people already engaged in or contemplating criminal activity. *Id.* at 1438 (citations omitted).

■ Indeed, *Bogart,* as well as other cases from this Circuit make clear that the circumstances under which the outrageous government conduct defense will prevail are unusual. The narrow circumstances under which the defense will succeed are those where the "government is so involved in the criminal endeavor that it shocks our sense of justice." *United States v. Stenberg,* 803 F.2d 422, 429 (9th Cir.1986). *Stenberg* highlights the standard for outrageousness as follows:

> [c]onstitutionally unacceptable conduct includes, but is not limited to, situations

where law enforcement agents employed unwarranted physical or mental coercion, ... where "government agents engineer and direct the criminal enterprise from start to finish," ... and where the government essentially manufactures new crimes in order to obtain the defendant's conviction.

*Id.,* citing *Bogart,* 783 F.2d at 1438; *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983).

The Ninth Circuit has also held the threshold for outrageous conduct to require the "involvement of the government to be *'malum in se,'* " or require the government to have " 'engineered and directed the criminal enterprise from start to finish.' " *United States v. Williams,* 791 F.2d 1383, 1386 (9th Cir.1986), citing *United States v. Gonzales,* 539 F.2d 1238, 1239–40 (9th Cir.1976) (per curiam). Alternatively, the Ninth Circuit has required some "creative activity" on the part of the government to manufacture a crime where it did not otherwise exist, solely for the purpose of obtaining a conviction. *See, e.g., Greene,* 454 F.2d at 787; *accord Twigg,* 588 F.2d 373. Most recently, the court has held that the outrageous government conduct defense applies "when 'the police completely fabricate the crime solely to secure the defendant's conviction.' " *United States v. Winslow,* 962 F.2d 845 (9th Cir. 1992) (government's use of informant who arranged out-of-state trip, directed purchase of bomb components, and was paid $90,000 for his participation in investigation does not constitute outrageous government conduct), citing *United States v. Emmert,* 829 F.2d 805, 811 (9th Cir.1987).

■ In light of the fact that no "bright lines" define for the courts what conduct constitutes outrageous government conduct, Magistrate Judge Trumbull considered at least twenty-two factors before concluding that the government conduct in this case was outrageous. These factors, gleaned from numerous cases which have discussed the defense, are set forth in *United States v. Myers,* 527 F.Supp. 1206, 1223 (E.D.N.Y.1981).[5] These factors are

---

5. It is interesting to note that *Myers* involved charges arising from a government undercover bribery "sting" operation code-named Abscam.

similar to those used by the Ninth Circuit in evaluating government conduct.

This court has examined the *Myers* factors. It has also considered the factors in light of the relevant Ninth Circuit authority. After careful consideration, the court concludes that the outrageous government conduct defense does not apply here.

C. *Application of the Myers Factors*

1. Did the government initiate the criminal activity?

The government did not initially instigate the criminal activity in this case. The testimony is undisputed that Ghotra and Sondhi approached Ward with the intent to bribe him in exchange for work authorization cards. Nor, did the government initiate criminal activity after September 24. While the government was certainly receptive to all bribes after that date, the government did not overtly encourage or direct defendants to offer bribes in exchange for the work authorization cards. *See* RT 455, 467, 469. Where the government agents create the opportunity for criminal conduct, as was the case here, such government action has been held not to constitute outrageous conduct. *See Myers*, 527 F.Supp. at 1225.

2. Was the government's participation essential to the crime?

The government's participation at first was not essential to the crime. As the government points out, the crime of bribery is committed when a person corruptly offers or gives a thing of value to a government official to influence an official act. 18 U.S.C. § 201.

As the sting operation continued, however, the government's participation did become essential. The government had to issue the illegally-gotten INS work permits to proceed with its sting operation. The magistrate rightly points out that, by doing so, the government created a misimpression among the immigrant population. Creating a misimpression, however, is a part of many government sting operations. Because the immigrants were misled by the government's conduct does not necessarily protect them from the consequences of their actions. *See United States v. Simpson*, 813 F.2d 1462 (9th Cir.1987) (government conduct created misimpression by use of government informant to introduce defendant to "friends," who were actually FBI undercover agents).

3. Had the defendant engaged in similar criminal activity before the government agent came onto the scene?

Defendant Ghotra unquestionably engaged in similar conduct before the government sting operation began. Indeed, it was his very conduct that prompted the government to investigate the alleged bribes offered in exchange for work permits. Defendants Ahluwalia and Mahal,[6] however, appear to have come onto the scene after the sting operation began.

4. Was the activity of the government agent, when viewed alone, criminal?

In the investigation effort, Ward accepted bribe money in excess of a million dollars and he issued illegal work authorization cards. These actions, however, were authorized by the FBI as part of the sting operation. And although there is innuendo that Ward may have kept some bribe money for himself (thereby acting illegally), there is no convincing evidence to support the innuendo.

---

In short, the sting operation involved the use of undercover informants who created the opportunity for criminal conduct by offering bribes in return for defendant legislators' promises to introduce a private immigration bill. The defendants in that case included various Congressmen, a mayor and state senator, city councilmen and lawyers. In *Myers*, the trial judge denied defendants' motion to dismiss for outrageous government conduct. Many of the concerns raised by the defense in that case are similar to those raised here.

**6.** This court declines to consider the government's evidence that Mahal was sentenced in 1989 in the Eastern District to probation (for creating and supplying false writings and documents for use in making application for special agricultural worker status) as it was not in evidence before the magistrate judge and the government stated that its objections were based upon the record before her.

5. How easy or difficult is the job of law enforcement officers in combatting the kind of criminal activity involved?

and

6. Do the police need to use the kinds of tactics utilized in order to detect effectively the crime?

*Myers* recognized the difficulty in detecting and ferreting out illegal bribery schemes. That court explained in some detail that:

... Like drug offenses, bribery is difficult to detect. Both are "victimless crimes" in the sense that no one with knowledge of the usual transactions has a motive to report the illegality to law enforcement officials.

Moreover, with bribery, nothing more is required than the quick passing of money in return for a promise of performance by the public official of an act that appears to be an appropriate part of his public duties. With drug deals, at least one part of the transaction is clearly illegal—the contraband. With bribery, both parts of the transaction are apparently legitimate: (1) money and (2) actions by public officials. Detecting bribery, therefore, is probably even more difficult than detecting drug offenses.

527 F.Supp. at 1229.

The magistrate recognized the difficulty in detecting bribery, but took issue with the duration of the government's sting operation. R/R at 15. While this court does not necessarily condone this aspect of the investigation, it does not believe that it can be grounds to dismiss the indictments. Indeed, other courts have refused to find "outrageous" other sting operations which have lasted much longer. *See, e.g., id.* at 1210–1211 (bribery sting operation lasted for one year, yet outrageous government conduct defense did not apply).

7. Did the government provide the instrument or instruments (*e.g.*, the drugs, laboratory equipment, chemicals, money, suitcases) to commit the crime?

This case is unlike *Greene* and *Twigg* where, without question, the government provided essential instruments to the crime. Here, defendants are charged with bribery, where the mere offer of money is sufficient to commit the crime. Thus, the government's conduct is not essential to the performance of the crime. The magistrate rightly points out, however, that the government had to provide more than 1300 illegal work permits as well as a willing INS agent to consummate the illegal activity which took place throughout the course of the investigation.

8. If an informant was used, was the informant reliable? Did he have a criminal record?

and

9. Was the informant paid a fee contingent upon the number or importance of defendants apprehended or convicted?

and

10. Did the informant violate the law, or urge others to violate it?

Throughout the investigation, Gregory Ward, the government informant, was an INS employee. There is no evidence that Ward had a criminal record. In addition, from the recorded meetings with the bribers, he appears reasonably reliable. At worst, Ward's participation in the sting operation was sloppy on occasion. For example, several times he failed to follow the instructions of Agent Lack and AUSA Mitlyng. Moreover, there is no evidence that the government rewarded Ward for his cooperation. Finally, there is no question that, by his actions, Ward effectively encouraged others to bribe him. By his words, however, Ward did just the opposite. Indeed, on several occasions he told some of the bribers that their actions were against the law. RT 352.

11. Did the informant or the undercover agents exert pressure or use threats on defendants to induce them to commit the crime?

and

12. Did the informant or the undercover agents engage in other activities, not directly related to the crime, which violated the law or were dishonorable?

There is no evidence that the government pressured or threatened defendants to com-

mit the crimes. Nor is there evidence that Ward committed other crimes or acted "dishonorably."

**13. Did the government agents show a proper regard for judicial and police processes?**

This court agrees with the magistrate that this is not a case where the government conduct involved a deliberate disregard for judicial or policy procedures. Admittedly there were some problems with the investigation—for example, Ward failed to follow the instructions of his superiors on occasion, and otherwise acted without prior supervisorial approval. These problems, however, do not rise to the level of "shocking the conscience." *See* Discussion of Factor # 20, *infra,* p. 1500.

**14. Did the government's agents perjure themselves by false reports to the police, to a judge, or to a grand jury?**

Concomitant with the magistrate's conclusion, this court finds no persuasive evidence that FBI Agent Lack or Ward perjured themselves during the proceedings.

**15. Did the activities of the agents actually harm innocent citizens not the subject of the investigation?**

It does appear that innocent people may have been harmed by this investigation. There is testimony that it was nearly impossible to obtain documents legally because the press of business to issue purchased cards had overwhelmed the office operations. It is difficult, however, to quantify this harm. It is possible that those immigrants who were unable to obtain work permits simply went away empty handed. It is also possible that those same immigrants resorted to bribery. The government is unable to say with certainty whether some of the approximately 1300 cards it issued during the investigation went to applicants who qualified for the cards under the Amnesty Program. Moreover, there is some testimony showing that Hispanic applicants, who had previously used the Salinas office, no longer frequented the office after the sting operation began.

In addition, the sting operation lured approximately 500 to 600 people to the vicinity of the Salinas INS office. The office had to request local police to provide extra security because of the crowds and traffic. Local shopkeepers complained of crowds, trash and rowdiness.

**16. Did the activities of the government agents have any direct adverse social consequences?**

Unquestionably, the immigration system suffered some damage as a result of this operation. Some people were led to believe that bribery was the only way to obtain a permit to work in this county.

The magistrate emphasizes that this operation preyed on the language problems of the Indian immigrants. She also emphasizes that the Indian immigrants may have had "different experiences with governmental bureaucracies elsewhere. . . ." R/R at 18. This Circuit has noted, however, that the exploitation of a defendants' weakness is not necessarily a basis for finding outrageous government conduct. *See Simpson,* 813 F.2d at 1467 (finding no outrageous government conduct where the sting exploited "an emotionally intimate relationship between lovers"), citing *United States v. Penn,* 647 F.2d 876, 880–84 (9th Cir.1980) (en banc); *United States v. Smith,* 802 F.2d 1119 (9th Cir.1986) (finding no outrageous government conduct where government used defendant's brother as an informant, where defendant had emotional problems and was very dependent upon his brother). Further, no case has been cited which suggests that the fact that immigrants may be particularly susceptible to committing bribery because of experiences with their former governments restricts the use of an undercover operation by the United States government.

**17. Did the undercover agents stand by while crimes were being committed in their presence?**

This court agrees with the magistrate judge that there is no evidence that crimes other than those involved in the sting operation were being committed. While there was some confusion among some members of the public as to the activities at the Salinas INS office, the government cannot be faulted for acting secretively when it received inquiries. Secrecy and deceit are

some of the unsavory parts of undercover investigations. The secrecy in this investigation does not rise to the level of a constitutional violation.

18. What was the value to law enforcement of the information being obtained by the informant and undercover agents?

Ward provided important information to law enforcement about the nature and extent of the bribery. He tape recorded certain conversations, and he was observed by law enforcement taking bribes. Although the expanded sting operation was not well controlled and Ward and the undercover agents failed to maintain accurate records of all the money received and people involved, the information obtained in the latter part of the operation did continue to have some value.

19. How important was the crime and its detection in the overall social scheme?

The detection of bribery is important to the social scheme and to the continued credibility of our government.

20. How closely were the informant's activities supervised by the government agents?

Defendants (and the magistrate judge) make much of the fact that the FBI failed to supervise Ward closely. Defendants argue that Ward disregarded plans and guidelines. They point out that many of his contacts with 'bribers' were untaped and that he encouraged the expansion of the operation by ignoring limitations. They note that he was sloppy in keeping track of money, accounts and people.

The facts, however, do not support the conclusion that a due process violation occurred. First, defendants cite no authority holding that the Constitution requires the FBI to impose a particular degree of supervision on an informant. Second, even though admittedly a lack of supervision connotes a defect in an investigation, the relevant question is whether the defect affected the reliability of the result. *See Myers*, 527 F.Supp. at 1230. The government did obtain reliable evidence, although admittedly, a more controlled and focused investigation would have been preferable. Finally, contrary to defendants' assertions,

Ward's discretion in this investigation was not unfettered. He reported to his superiors on a regular basis. He also delivered the tapes and the money to his superiors.

21. Was the claimed outrageous conduct of the agents an isolated instance, or was it part of a widespread and continuous system?

This court finds, as did the magistrate judge, that the conduct of the agents was isolated.

22. Did the investigative technique complained of produce a substantial danger of unreliability and thereby potentially expose innocent people to prosecution and possible conviction?

This court does not find based upon the evidence presented that the investigative techniques were so unreliable that they expose potentially innocent people to prosecution and possible conviction.

V. Conclusion

After weighing the factors outlined above and given the totality of circumstances in this case, the court hereby declines to accept the recommendation of the magistrate judge. Although the court concurs with some of the magistrate judge's criticism of the expanded sting operation, the court does not find that the government's conduct deprived defendants of due process of law. The circumstances here do not show outrageous government conduct as defined in the cases and as call for dismissal of an indictment. Therefore, the motion to dismiss the indictments of these defendants or any portions of their indictments, is denied.