Filed 3/30/16  P. v. Green CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESSE ANDREW GREEN,<br><br>    Defendant and Appellant. | G049356<br><br>(Super. Ct. No. 10WF2451)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed.

Law Offices of Okabe and Haushalter, Mark Jerry Haushalter and Ryan Okabe; Law Offices of Bruce Zucker, Bruce Alan Zucker and Randy Kravis for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Raquel M. Gonzalez, and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

This case tells the tale of two police officers whose actions do nothing to improve the embattled reputation of law enforcement personnel in modern day America. The first officer, appellant Jesse Andrew Green, was convicted of forcibly sodomizing three women he dated while he was a member of the Garden Grove Police Department. The second officer, Huntington Beach Police Detective Michael Szyperski, was tasked with investigating appellant's crimes. During appellant's trial, it became clear Szyperski may have falsified evidence and committed perjury. His testimony about when he received and how he handled certain evidence was so suspect the prosecutor ended up taking the stand in order to shed light on these issues, which led to his recusal. Even though the jury was instructed it could find Szyperski untrustworthy if it believed he intentionally withheld evidence, appellant contends that instruction did not go far enough, and his case should have been dismissed due to outrageous governmental conduct. Some of Szyperski's testimony was highly questionable, to be sure. But we do not believe the extreme remedy of dismissal was constitutionally mandated in this case. Nor do we believe appellant has shown any other grounds for reversal. We therefore affirm the judgment.

FACTS

In late 2004 or early 2005, shortly after he began working as a police officer, appellant met Gina T. through an online dating site. Following their initial date at a restaurant in February 2005, they did not meet again until November of that year. During that month, they had consensual sexual intercourse at Gina's apartment on two separate occasions. Then they did not see each other again until the night of April 28, 2006.

That evening, appellant and Gina had several drinks at Gina's apartment before entering her bedroom to have sex. When they started having intercourse, Gina told appellant she was not comfortable having unprotected sex. She asked him to put on

2

a condom, but he refused, saying "[w]e are . . . a team now. . . . [I]f I have herpes, then you have herpes. We're all in this together."

Taken aback by appellant's statements, Gina got up and went into the bathroom. She was not inclined toward further intimacy, but when she returned to the bed, appellant was very nice to her, so she gave him another chance. As he was sweet-talking her, he turned her over on her stomach and said he was going to do something she would really like. Gina was expecting a massage, but instead appellant spit on her anus and proceeded to sodomize her. Although Gina cried out in pain and told appellant to stop, he did not relent for some time. When he finally stopped, Gina went into the bathroom again, more confused and worried than ever.

A few minutes later, she returned to the bed, and the pattern repeated itself. Appellant turned on the charm, she let down her guard, and suddenly, appellant's mood changed, and he became very aggressive. After flipping Gina over on her stomach, he forcibly sodomized her while calling her a "fucking bitch" and a "fucking whore." He also pushed her face into the mattress, making it hard for her to breathe. Somehow, Gina managed to get up and scurry into the bathroom, at which point appellant moaned, "I almost came" and demanded she "finish [him] off." Fearful appellant's violence would escalate if she refused, Gina came back into bed and orally copulated him until he ejaculated. Appellant then got dressed and left Gina's apartment.

The next day, Gina called appellant to find out why he had acted that way. She did not want to be confrontational, so when appellant did not answer her call, she left a brief voicemail saying she just wanted to make sure he got home okay and for him to call her. That day, Gina also called the rape crisis hotline and the Santa Ana Police Department. When interviewed, she said she was having difficulty coming to terms with what appellant had done to her. Feeling both angry and ashamed, she asked the investigating officer if he felt she had been raped. She also told the officer she did not think she had the emotional strength to press charges against appellant. However, on the

3

officer's advice, she did seek a restraining order against appellant. In opposing the order, appellant told the court that Gina was the aggressor in their relationship and that she initiated all of the sexual activity that occurred on the night in question. Following the hearing, Gina did not see appellant again until two or three years later, when she spotted him at a coffee shop. Fearful appellant was stalking her, she called the Garden Grove Police Department and told appellant's supervisor what he had done to her.

As was the case with Gina, appellant met his second victim, Abigail U., through a computer dating site. Less than a week later, on the night of February 25, 2009, they had dinner and drinks at a restaurant in Huntington Beach before retreating to appellant's nearby apartment. By that time, Abigail had decided to stay the night at appellant's place rather than risk driving home while intoxicated. After downing another glass of wine, she began "making out" with appellant in the living room. Then they moved into the bedroom, where appellant started getting more assertive. While holding Abigail down on the bed, he pulled her pants down. She told appellant to ease up, but he inserted his penis inside her vagina and started thrusting.

Abigail struggled to get away, but appellant just became more aggressive. After turning Abigail over on her stomach, he grabbed her hair and pushed her face into a pillow. Then he spit on her anus and sodomized her for several minutes. Although Abigail was crying and telling appellant to stop, he did not relent. To add insult to injury, he called her a slut and a whore and threatened to give her an "STD" before finally letting up and falling asleep. At that point, Abigail sneaked out of the apartment and drove home. She did not report what happened because appellant was a police officer and she did not think anyone would believe her word against his.

Over the course of the next few days, appellant called Abigail repeatedly and told her he was sorry for what he did. Outwardly, Abigail accepted his apology; she told appellant she had a great time on their date, called to wish him a happy birthday, and even agreed to see him again. However, at trial, Abigail said the only reason she did

4

these things was because appellant was a police officer and she feared he had the ability to find out where she worked and lived. As it turned out, her second "date" with appellant, which took place on March 7, 2009, was uneventful. He acted nice and apologized for his previous behavior, and she ended up staying the night at his apartment – but without sex.

The two had some phone contact after that, but eventually Abigail got married and moved on with her life. Out of curiosity, she visited appellant's Facebook page in July 2011, just to see what he was up to. There, she discovered an article implicating appellant as a suspect in two incidents of alleged forcible sodomy. The article included the contact information of Huntington Beach Police Detective Michael Szyperski. Thinking appellant might be a serial sex offender, Abigail called Szyperski and reported what appellant had done to her in 2009.

That was the year appellant met his third victim, Marissa S. After being introduced through a mutual friend, appellant and Marissa shared several flirty emails and photos before finally meeting in person on November 5, 2009. Following dinner and drinks in Newport Beach that evening, they went to appellant's apartment for a nightcap. Marissa was attracted to appellant and felt safe being with him because he was a cop and because he was acting very nice to her. However, when they went into the bedroom to have sex, appellant's kind and considerate persona disappeared.

As they were undressing on the bed, appellant refused Marissa's request to put on a condom. Although she said she was afraid of getting AIDS, appellant commenced intercourse without protection. He then told Marissa he did in fact have AIDS, and she was going to die in five years. Terrified, Marissa begged appellant to stop and tried to get away. She even lied and told him she had herpes, in the hope he would relent. However, appellant continued on, calling her a whore and a slut one moment, and telling her he loved and wanted to marry her the next. At one point, crying and out of breath, Marissa said she needed her asthma inhaler. Appellant told her to wait until he

5

was done and proceeded for about 10 more minutes before finally pulling out and ejaculating on her stomach.

Afterwards, appellant calmed down and apologized to Marissa. He said he couldn't handle his alcohol and was just acting because he wanted to "play rough" with her. He also got Marissa's inhaler for her and checked her pulse. He was so nice and attentive to Marissa she began to think he might very well have been acting before. So, after taking a shower, she got back in bed with him and accepted his invitation to stay the night. By that time, it was after midnight and she simply wanted to go to sleep. That was not the end of her ordeal, however.

During the night, she got cold and put her arm around appellant. He awoke with an erection and asked her to rub his penis, which she did. He then turned her over on her stomach and got on top of her. Saying he wanted to have sex again, appellant placed his penis on Marissa's buttocks. She told him she did not like anal sex, and he assured her he was not going in that direction. But moments later, he spit on her anus and penetrated it with his penis. Marissa cried out in pain and told him to stop, but he put a pillow over her head and pushed her face down into the mattress to muffle her screams. Then, over Marissa's pleas for mercy, he sodomized her for about five minutes before getting tired and flaccid.

At that point, Marissa jumped out of bed, grabbed her phone and threatened to call 911 if appellant so much as touched her again. She then hastily gathered her belongings and ran out of the apartment. When she got to her car, she was too distraught to drive, so she slept in her car for a couple of hours. She did not call the police because she feared appellant would find out where she lived and come after her. She was also worried the police would not believe what happened because appellant was a police officer and she had been drinking that evening.

When the sun came up that morning, Marissa drove home, took a shower, and told two of her friends what appellant had done to her. She also went to the hospital

6

and reported she had been raped. The doctor who examined Marissa urged her to report the incident to the police, and she was open to doing so. However, as it turned out, no female police officers were available to come out and meet with her at that time. Given what she had been through, Marissa did not feel comfortable talking about the incident with a male police officer, so she left.

Five days later, on November 11, 2009, Detective Szyperski and Huntington Beach Police Officer Catherine Meza went to Marissa's apartment to ask her what happened. Not expecting the officers, Marissa was reluctant to talk to them. Although she alleged appellant had raped and sodomized her, she said she did not want to press charges because she feared appellant would track her down and kill her. The officers told Marissa they could not guarantee her protection if she reported appellant, but she could seek a restraining order against him. They also told her reporting appellant would prevent him from victimizing other women. Marissa said she would think it over and let them know if she changed her mind.

Over the next few days, Marissa discussed the matter with her friends and decided to make a formal complaint against appellant. So, on November 16, 2009, she went to the Huntington Beach Police Department (HBPD) and told Szyperski everything that happened. During the course of that interview, which was recorded, Marissa also spoke with Szyperski about a letter she had recently received in the mail that scared her. Postmarked from Huntington Beach, the letter included a business card from Vero's House Cleaning Services. On the card, there was a short handwritten note that read, "Marissa, Vero is the cleaning lady I told you about. Highly recommend her services. Give her a try. J."

Given that appellant's first name is Jesse, and because he was the only person Marissa knew in Huntington Beach whose name began with the letter J, she suspected the letter came from him. She was very afraid because she felt the letter was appellant's way of telling her to "clean house," i.e., get rid of the evidence of their

7

encounter and keep her mouth shut about what he had done to her. And since the letter was sent to her home, she was worried appellant knew where she lived and could easily track her down. In fact, Marissa was so frightened by the letter she did not sleep at her own apartment after receiving it. The first few days she slept at a friend's house, and then on November 24, 2009, she left the country altogether. She told her family and friends she was going to Sweden, but she actually went to her native El Salvador. After six months abroad, she returned to the states and was contacted by Szyperski. At that time, she did not want to assist in appellant's prosecution. She eventually changed her mind and agreed to cooperate on the case.

Appellant's trial took place in 2013. Testifying on his own behalf, he steadfastly denied any wrongdoing. While admitting he had sex with each of the alleged victims, he claimed it was all consensual, including the anal penetration. In rebuttal, the prosecution presented evidence of an uncharged date rape that appellant allegedly committed in 1998 against a woman named Wendy N. The evidence was admitted for the limited purpose of showing appellant's motive for and intent in committing the charged offenses. The jury convicted appellant of three counts of forcible sodomy, representing one count as to each victim. The court sentenced him to six years in prison on the base count, plus consecutive three-year terms on the remaining two counts, for an aggregate term of 12 years.[1]

## DISCUSSION

### *The Claim of Outrageous Governmental Conduct*

Appellant contends Szyperski violated his due process rights by falsifying evidence and improperly influencing Marissa's testimony. While we are troubled by certain aspects of Szyperski's testimony, we do not believe the record contains evidence of outrageous governmental conduct warranting a dismissal of the charges.

---

[1] The prosecution also charged appellant with one count of forcible rape as to Abigail. However, the jury deadlocked on that charge, and it was ultimately dismissed.

To properly evaluate appellant's claim, we must recount its factual background in some detail, starting with the defense theory of the case. One of the main themes of defense counsel's opening statement was that Szyperski did not investigate the case in a fair and impartial manner. In particular, defense counsel claimed the evidence would show Szyperski lied about when Marissa gave him the house cleaning letter in order to explain why she left the country and was hesitant to cooperate with the prosecution. Defense counsel also asserted the evidence would show Szyperski fed Marissa information about the Gina T. incident so Marissa could tailor the details of her allegations to match those made by Gina.

At trial, the evidence regarding the house cleaning letter was convoluted. While it is undisputed Marissa first spoke to Szyperski (along with Meza) at her house on November 11, 2009, and she gave a formal interview to Szyperski at the police station five days later on November 16, the testimony as to when she actually gave the letter to Szyperski was anything but clear. On direct examination, Marissa initially testified she received the letter and called Szyperski about it after the formal interview on November 16. But then, to help refresh her recollection, she was shown a transcript of that interview. The transcript reflects that not only did she and Szyperski discuss the letter during the interview, she also gave the letter to him at that time.

In light of this, Marissa conceded she must have received the letter before that interview. However, she insisted she gave the letter to Szyperski after the interview occurred. Without specifying exactly when that was, Marissa claimed the transfer occurred at a coffee shop, in the presence of her daughter and her daughter's boyfriend. And soon after that, she took a flight to El Salvador. Asked if the letter is what prompted her to leave the country, Marissa testified it was more complicated than that. Although the letter contributed to her fear of appellant, Marissa said she fled the country because she learned one of her friends had informed appellant that she (Marissa) had reported him

9

to the police. Marissa was extremely worried that appellant might try to harm her if he found out she was cooperating with the authorities.

Marissa's cross-examination did little to clarify the timing issue. At first, she said she received the letter on November 15 and gave it to Szyperski the following day when he interviewed her at the police station. Indeed, she said she specifically remembered tendering the letter to Szyperski at that time. But following further questioning on the issue, she testified she gave the letter to Szyperski at a coffee shop, right before she left the country. In defense of her contradictory testimony, Marissa said, "It has been three, almost four years. I have forgotten some details[.]" However, she said she was sure that she only gave the letter to Szyperski on one occasion. She just could not remember if that was on November 16 or on a subsequent date. Marissa also testified she never talked to Szyperski about the issue as to when she gave him the letter. In other words, he never coached her about how to testify regarding the letter transfer.

Although Szyperski was the lead detective on Marissa's case, the prosecution did not call him as a witness at trial. Instead, it was the defense who called him to the stand. Explaining the sequence of events, Szyperski testified he received a voicemail from Marissa in the early morning hours of November 23. In the message, Marissa sounded upset over a letter she had received from appellant so Szyperski called her back and they made arrangements to meet at a coffee shop in Laguna Nigel later that morning. At the meeting, Marissa gave him the house cleaning letter, which was inside a plastic sandwich bag. Then he drove to the HBPD and booked the letter into evidence. Szyperski thought the letter was fairly innocuous because it did not contain any explicit threats or directly implicate appellant in any criminal activity. However, he did submit the letter for DNA and fingerprint analysis. As it turned out, none of the forensic testing connected appellant to the letter.

Challenging Szyperski's claim that Marissa gave him the letter on November 23, defense counsel asked him about the interview transcript of November 16,

which indicates Marissa gave him the letter on that date. Szyperski said he did "review" the letter with Marissa on the 16th. However, he did not "retain" it at that time, perhaps because it was only a copy. However, Marissa testified she gave Szyperski the original letter, and he never gave it back to her.

Moreover, the property tag on the letter indicates it was booked into evidence at the HBPD on November 16, not November 23. Attempting to explain how this could be, Szyperksi testified he booked several pieces of Marissa's clothing into evidence when he met with her on the 16th, including the pants and boots she wore on the night appellant allegedly sodomized her. Szyperski said that when he filled out the property tags for those items on the 16th, he happened to fill out a few extra tags with that date that he ended up not using. So, he tossed those extra tags into his desk drawer, thinking nothing of them. However, when he obtained Marissa's letter on the 23rd, he "inadvertently" used one of those predated tags when he booked the letter into evidence that day.

The main problem with this explanation is that it was contradicted by the internal bookkeeping records of the HBPD. Although Szyperski testified he booked the letter into evidence on November 23, those records, which were computer-generated, showed the letter was booked into evidence on November 16.

That was not the only troublesome aspect of Szyperski's testimony. Things got even more convoluted when he testified about the various police reports he wrote in connection with the case. Szyperski said he did not get around to writing his initial report about the letter until January 2010. At that time, he did not realize the property tag on the letter was dated November 16. In fact, Szyperski testified he did not discover this alleged error until he was preparing for the preliminary hearing, which was held in March 2012. Szyperski said he made a supplemental report to explain the alleged error at that time, but his supplemental report is dated July 24, 2012. And neither defense counsel nor the prosecutor knew about the supplemental report when appellant's trial started in 2013.

11

As a matter of fact, the supplemental report did not come to light until the middle of Szyperski's direct examination. At that point, the court excused the jury and discussed the matter with counsel. After Szyperski supplied the parties with a copy of his supplemental report, the court asked the prosecutor, Eric Scarbrough, if he was aware of the report, and he said no. Asked why that was, Scarbrough replied, "I don't have an explanation for it. I . . . have requested all the reports from [Szyperski] on a couple of occasions. Other than inadvertence by [Szyperski], I don't know . . . why we [didn't get the supplemental] report."

The court then asked defense counsel what remedy he proposed to address the untimely disclosure of the report. Defense counsel said he wanted to keep his options open. Although he was sure he did not want a mistrial, he surmised an instruction informing the jury Szyperski had lied and withheld evidence might be appropriate. Finding Szyperski's failure to disclose the report in a timely manner "disturbing," the court said it might be inclined give an instruction along those lines. However, the court said it wanted to know more about the issue before making a final decision on the matter.

With that in mind, the court allowed defense counsel to question Szyperski outside the presence of the jury during an Evidence Code section 402 hearing.[2] At the hearing, Szyperski testified he did not say anything about the alleged booking error at the preliminary hearing because no one asked him about it. Yet the preliminary hearing transcript reveals Szyperski was questioned about when he booked the letter into evidence at the HBPD. As noted above, Szyperski also testified during trial that he discovered the alleged error while he was preparing for the preliminary hearing and that he wrote up a supplemental report about the error at that time. But this was not true because the preliminary hearing took place in March 2012, and Szyperski did not prepare his supplemental report until July of that year. Asked about that discrepancy at the

---

2        Unless noted otherwise, all further statutory references are to the Evidence Code.

12

section 402 hearing, Szyperski said he thought appellant's preliminary hearing was not conducted until October 2012.

At the section 402 hearing, Szyperski also testified that he forwarded his supplemental report to the District Attorney's office about the same time he prepared it. He also recalled having a phone conversation with Scarbrough shortly thereafter. According to Szyperski, Scarbrough was very angry with him and sort of "bawled him out" for not turning the report over to him sooner. However, Szyperski told Scarbrough he made the report and gave it to him as soon as he discovered the alleged error about the date on the letter's property tag.

Following Szyperski's testimony at the section 402 hearing, the court met with counsel. At that time, the court again asked Scarbrough about the supplemental report, and he said that as far as he knew, he never saw it before trial. Although Scarbrough remembered speaking with Szyperski about other discovery issues in the case, he had no recollection of talking to him about that particular report. Given these representations, the court advised Scarbrough he might have to become a witness in the case. The court also stated that while Szyperski was clearly mistaken about certain things, it was not comfortable making any factual findings about whether he intentionally falsified evidence, or what effect that would have on his credibility. The court said it was still pondering how to instruct the jury and wanted to wait and see how the rest of the testimony played out before deciding what to do.

Szyperski resumed his direct examination in front of the jury. Consistent with his testimony at the section 402 hearing, Szyperski said he discovered the alleged error on the letter's property tag in July 2012. He also said he sent Scarbrough a supplemental report regarding the error and discussed the report with him around that time. Szyperski denied he ever spoke with Marissa about the error or attempted to influence her testimony in any respect. He stuck by his initial testimony that while he reviewed "some form" of the letter when he interviewed Marissa on November 16, 2009,

13

he did not actually "take possession" of the letter and book it into evidence until a week later, on November 23.

As for his initial meeting with Marissa at her apartment on November 11, Szyperski testified he was aware at that time that appellant was suspected of committing sex crimes against Gina T. However, he did not share any information about Gina's case with Marissa during their meeting on the 11th.

Defense counsel was not buying any of that. In fact, after Szyperski finished his direct examination, defense counsel moved to dismiss the case on the basis Szyperski had perjured himself and corrupted Marissa's testimony by colluding with her about certain aspects of the case. In arguing the motion, defense counsel theorized "if the jury concludes that the [house cleaning letter] was booked on the 16th and not the 23rd, then they're going to be compelled to conclude that not [only did Szyperski lie] about that and [about the alleged] meeting [with Marissa on the 23rd], but that he got Marissa to go along with" his lies. Defense counsel asserted Szyperski made up the story about meeting with Marissa on the 23rd "in order to give truth and meaning to her immediate flight" thereafter. Counsel also claimed that if Szyperski was lying about when he received the letter and booked it into evidence, it would give greater credence to the defense theory that Szyperski leaked information about Gina's case to Marissa so she could tailor her allegations to match Gina's.

Invoking both due process and the statutory provisions respecting discovery in criminal cases, defense counsel alleged Szyperski's deceitful conduct "soiled the case," necessitating a dismissal. Alternatively, defense counsel asked the court to instruct the jury Szyperski intentionally interfered with the defense to gain a tactical advantage in the case. The trial court did not think Szyperski's actions rendered appellant's trial unfair. Rather, it simply believed there had been a violation of the discovery rules, which could be addressed in a curative instruction to the jury. Therefore, it denied appellant's dismissal motion.

14

However, as a sanction for the prosecution's late disclosure of Szyperski's supplemental report, the court ruled the prosecution could not call Kevin Diegitz as a witness in rebuttal. Diegitz was the boyfriend of Marissa's daughter in 2009. According to Marissa, he was present when she gave the letter to Szyperski at the coffee shop on November 23, 2009, so presumably he would have corroborated Marissa and Szyperski's testimony about that exchange.

In denying appellant's dismissal motion, the court made it clear it did not believe Szyperski's handling of the house cleaning letter was a particularly important issue in the case.[3] Instead, the court felt the case hinged on whether appellant's alleged victims were telling the truth about the underlying allegations. The court surmised, "If the jurors believe what [the victims] have said, Mr. Green is going to get convicted. If the jurors don't believe what they said, irrespective of everything else, Mr. Green may not get convicted." The court also expressed its belief the jury, as the trier of fact, was in the best position to assess the intentionality and materiality of Szyperski's alleged misconduct.

When trial resumed the next day, the defense called Scarbrough to the witness stand.[4] On direct examination, Scarbrough testified he did not believe he ever saw Szyperski's supplemental report before Szyperski brought it up during his direct examination. Nor did he have any recollection of discussing the report with Szyperski. However, if he had received the report, his habit and practice would have been to forward a copy to the defense because it was discoverable and relevant to the case.

On cross-examination, Scarbrough testified he did not remember every conversation he had with Szyperski. And although he does not believe they ever

<hr />

[3] Unlike Szyperski's supplemental police report, the house cleaning letter was disclosed to the defense in the normal course of discovery.

[4] The prosecution's office was prepared for this eventuality. It had deputy district attorney Nicole Nicholson ready to take over for Scarbrough the moment he was called as a witness in the case, and she handled the remainder of the case for the state.

discussed the house cleaning letter, he does recall getting angry with Szyperski about how he booked other items into evidence. All told, Scarbrough estimated he had about 600 pages of discovery to deal with in this case.

Following Scarbrough's testimony, defense counsel expressed concern Scarbrough was trying to create the false impression Szyperski's supplemental report may have gotten lost or inadvertently misplaced. Defense counsel argued this was inconsistent with Scarbrough's initial representations, but the court disagreed and was confident the jury could sort everything out. The court remarked, "I don't think the jury has any alternative based on this testimony other than to believe that [Szyperski's] recollection is either wrong or it's intentionally wrong. I haven't been surprised by anything Mr. Scarbrough said, and I don't think it's inconsistent with his [earlier] presentation to the court."

The final evidence in the case came from Szyperski himself. Following Scarbrough's testimony, he retook the stand and spoke at length regarding his investigation into Marissa's allegations. Szyperski testified that when he initially interviewed Marissa at her apartment on November 11, 2009, he knew appellant was a suspect in a sexual assault case arising out of Santa Ana, i.e., the Gina T. case. Szyperski even faxed the Santa Ana Police Department and requested copies of the police reports associated with that case. However, he did not receive any specific information regarding that case until *after* talking to Marissa on the 11th.[5] And even then, he did not share any of that information with Marissa.

Regarding the stationhouse interview with Marissa on November 16, Szyperski admitted Marissa showed him the original house cleaning letter at that time. He said it was a "mistake" not to retain the letter then, but in reading it, he did not think it was particularly important to his investigation. Nevertheless, when Marissa gave him the

---

[5]     The timing of the fax transmissions between Szyperski and the Santa Ana Police corroborated Szyperski's testimony in this regard.

letter at the coffee shop on the 23rd, she was clearly frightened. Szyperski tried to assuage her fears by telling her she could seek a restraining order against appellant. However, the following day, November 24, he received an email from Marissa informing him she was leaving the country because she did not feel safe.

Szyperski testified he did not collude with Marissa to fabricate the coffee shop meeting, nor did he prepare any false reports in the case. While conceding he was not as careful as he could have been in terms of booking certain items into evidence, he insisted he had no ill will toward appellant and made no attempt to manipulate the evidence to make him look guilty.

In its closing instructions, the court told the jurors "the prosecution team did not timely disclose [Szyperski's supplemental police report]. [¶] If you find that any member of the prosecution team, including but not limited to . . . Szyperski, intentionally withheld evidence or intentionally failed to comply with his discovery obligation, then you may find that such member of the prosecution team is biased and that his testimony is therefore untrustworthy." Appellant contends this instruction was insufficient to cure the prejudice stemming from Szyperski's conduct, and the case should have been dismissed due to outrageous government conduct. We cannot agree.

To prevail on a claim of outrageous government conduct, the defendant must show the state engaged in conduct that shocks the conscience or is repugnant to the universal sense of justice. (*Rochin v. California* (1952) 342 U.S. 165; *United States v. Montoya* (9th Cir. 1995) 45 F.3d 1286, 1300; *People v. Guillen* (2014) 227 Cal.App.4th 934; *People v. Uribe* (2011) 199 Cal.App.4th 836.) Few cases rise to this level. (See *United States v. Santana* (1st Cir. 1993) 6 F.3d 1, 4 [noting "the banner of outrageous misconduct is often raised but seldom saluted"]; Meister, *When Nothing is Shocking: The Ninth Circuit Degrades the Outrageous Government Conduct Defense*, 22 Loyola L.A. L.Rev. 843 (1989).) And the ones that do invariably involve situations where the state has either: 1) violated the defendant's bodily integrity (*Rochin v. California, supra,* 342

U.S. 165 [police forcibly pumped suspect's stomach to obtain evidence]; 2) entrapped the defendant into committing a crime (*Greene v. United States* (9th Cir. 1971) 454 F.2d 783 [government agents engineered and directed the defendant's alleged criminal activity from start to finish]; or 3) intentionally interfered with the defendant's right to counsel (*People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439 [prosecutor provided defense counsel with false evidence to gain a tactical advantage in plea negotiations]).

Appellant's case does not fall into any of these categories, nor does it convincingly suggest a new one. In fact, while labeling his claim as one involving outrageous government conduct, appellant's brief makes clear he is actually relying primarily on a different line of cases – those dealing with the use of perjured testimony – to support his contention that a dismissal was warranted. As appellant notes, the use of such testimony to obtain a criminal conviction violates due process. (*Napue v. Illinois* (1959) 360 U.S. 264, 269; *People v. Sakarias* (2000) 22 Cal.4th 596, 633; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1192.) And while the defendant does not have to show the prosecutor knew the subject testimony was false in order to obtain a dismissal, he does have to prove it was material to his case. (*Smith v. Phillips* (1982) 455 U.S. 209, 220, fn. 10; *People v. Marshall* (1996) 13 Cal.4th 799, 829-830; *People v. Gordon* (1973) 10 Cal.3d 460, 473.) Appellant has failed to carry his burden in that regard.

Appellant's materiality argument is centered around the house cleaning letter Marissa received in the mail prior to leaving the country. Although the letter is facially innocuous, and the police were unable to prove who sent it, appellant argues Szyperski's handling of the letter and his testimony regarding the same prove he colluded with witnesses to fabricate evidence and effectively corrupted the fact finding process in this case. In so arguing, appellant attaches tremendous significance to the fact Marissa apparently gave the letter to Szyperski on November 16, as opposed to November 23, which is when Szyperski claimed Marissa gave it to him. Appellant asserts Szyperski lied about the dates to make it appear as though the letter is what prompted Marissa to

leave the country. But the exact timing of the letter transfer was really not that important in the big scheme of things.

Marissa did testify she left the country around November 23. However, it is clear from the record she was terrified of appellant from the moment he attacked her on November 5. And that wasn't just because appellant had sexually assaulted her; she was extremely worried what appellant might do to her if he found out she had reported him to the police. Indeed, Marissa testified that one of the reasons she left the country was because she learned her friend had alerted appellant to the fact that she (Marissa) had been speaking to the police. While Marissa admitted the house cleaning letter contributed to her fear of appellant, it is apparent she had plenty of other reasons to want to hide from him. So whether she gave the house cleaning letter to Szyperski on the 16th or the 23rd was largely immaterial. Her credibility did not hinge on whether she left the country immediately upon receipt of the letter or waited a week before leaving. We do not see how Szyperski's alleged manipulation of the dates could have affected the jury's impression of appellant or hinted at any type of conspiracy between Szyperski and Marissa.

Moreover, since the alleged falsity of Szyperski's testimony was fully exposed to the jury, it cannot be said that appellant's conviction was based on perjured testimony. (See *People v. Marshall, supra*, 13 Cal.4th at p. 830 [the danger associated with perjured testimony is ameliorated by the presentation of evidence showing its falseness]; *People v. Morales, supra*, 112 Cal.App.4th at p. 1193 [same].) Throughout the trial, the truthfulness of Szyperski's testimony was undermined in several important respects. He claimed he received the house cleaning letter from Marissa on November 23 and booked it into evidence that day. However, the transcript of Marissa's stationhouse interview and the internal records of the HBPD indicate Szyperski received and booked the letter on November 16. Szyperski's testimony about when he discovered this discrepancy and prepared his supplemental police report was also shown to be inaccurate.

19

And his claim that he turned over his supplemental report to prosecutor Scarbrough before trial was consistently refuted by Scarbrough himself.

The prosecution's failure to disclose the supplemental report in a timely manner even led to a jury instruction casting doubt on Szyperski's credibility. While the instruction did not require the jury to find Szyperski was untrustworthy, defense counsel had an embarrassing plethora of ammunition with which to disparage Szyperski's veracity in closing argument. Seizing on Szyperski's duplicitous testimony, defense counsel called him a bold-faced liar who "tainted [the] case with unfairness and with deceit." He also accused Szyperski of throwing Scarbrough "under the bus" to save his hide. Even the prosecutor who replaced Scarbrough acknowledged Szyperski handled the case in a careless and shameful manner, although she stopped short of calling him a liar.

When the prosecutor characterizes the investigation as careless and shameful, it cannot help getting the jury's attention. Under these circumstances, Szyperski's testimony about the house cleaning letter could only be viewed as highly suspect and potentially misleading. Because all of the facts pertaining to Szyperski's credibility were laid bare for the jury to consider, it cannot be said appellant's conviction was based on perjured testimony in violation of due process. (*United States v. Renzi* (9th Cir. 2014) 769 F.3d 731, 752; *People v. Riel* (2000) 22 Cal.4th 1153, 1180-1182.) The trial court did not err in refusing to dismiss the case.[6]

---

[6] In reaching this conclusion we do not condone Szyperski's actions in this case. It is abundantly clear from the record that his investigative methods and his dubious recounting of the same disrupted the judicial process and jeopardized the state's ability to obtain a lawful conviction against appellant. However, apart from the drastic sanction of dismissal, other remedies (both administrative and penal) are available to deter the police from engaging in unscrupulous conduct. (See generally *People v. Guillen, supra*, 227 Cal.App.4th at pp. 1002-1011 [noting that dismissal is generally not required in order to "send a message" to crooked state officials given the availability of other remedies].) Considering the way this case played out, it would not surprise us to learn those remedies have already been pursued against Szyperski.

*Sufficiency of the Court's Curative Instruction*

Alternatively, appellant contends the judgment must be reversed because the trial court's instruction respecting the untimely disclosure of Szyperski's supplemental police report did not go far enough in terms of punishing the prosecution for failing to comply with the rules of discovery. (See Pen. Code, §§ 1054 et seq.) Again, we disagree.

At the trial court's invitation, the parties submitted special instructions regarding the prosecution's failure to disclose Szyperski's supplemental report in a timely manner. Defense counsel proposed the jury be instructed, "The prosecution and/or their agent, Det. Szyperski, willfully withheld [the report] and only disclosed [it] in order to obtain a tactical advantage during this trial. This was a violation of law. Whether this unlawful withholding of evidence was by the [p]rosecutor, Det. Szyperski or . . . both is immaterial. Therefore this evidence is untrustworthy. You may infer that this unlawful, delayed disclosure of evidence . . . discloses a consciousness of a failure of proof against Jesse Green and an attempt by unlawful means to overcome that failure."

The trial court rejected this instruction as an invasion of the jury's core fact finding function. In its stead, the court told the jury, "Both the People and the defense must disclose, under California's discovery rules which apply to all criminal cases, their evidence to the other side before trial. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] The parties must disclose their evidence at least 30 days before trial begins. New evidence discovered within 30 days of trial must be disclosed immediately. In this case, the prosecution team did not timely disclose [Szyperski's supplemental police report]. [¶] *If you find that any member of the prosecution team, including but not limited to . . . Szyperski, intentionally withheld evidence or intentionally failed to comply with his discovery obligation, then you may find that such member of the prosecution team is biased and that his testimony is therefore untrustworthy.*"

21

Focusing on the italicized portion of the instruction, appellant contends the trial court erred in letting the jury decide the intentionality and materiality of the prosecution's discovery violation. In his opinion, the trial court should have told the jurors: 1) Szyperski's untimely disclosure of his supplemental report *was* willful; and 2) because of that, they *must* find that both the report and Szyperski were untrustworthy. However, an instruction to this effect would have unnecessarily invaded the jury's province.

"[C]ourts have broad discretion in determining the appropriate sanction for discovery abuse[.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 951.) Although there may be circumstances where it is appropriate to direct the jury to draw a negative inference from a party's violation of the discovery rules, there is no "talismanic form that a curative instruction must take[.]" (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 793.) "'The remedies to be applied need be only those required to assure the defendant a fair trial.' [Citations.]" (*People v. Zamora* (1980) 28 Cal.3d 88, 99 (*Zamora*).)

In *Zamora*, our Supreme Court reversed the defendant's convictions for resisting arrest and battering a police officer because the personnel files of the officers involved in defendant's arrest were destroyed by the government prior to trial. In remanding the case for retrial, the Supreme Court had to decide what sanction to impose on the state for denying the defendant access to evidence that could have supported his claim of self-defense. The Supreme Court determined the jury should be instructed the destroyed files contained evidence the subject officers had used excessive force in the past. (*Zamora, supra,* 28 Cal.3d at p. 102.) However, the court stopped short of telling the jury how to use that particular information. Instead of telling the jury the information necessarily rendered the officers incredible witnesses who were prone to misconduct, the Supreme Court sanctioned an instruction stating the jury "*may* rely upon that information to infer that the officers were prone to use excessive or unnecessary force [citation] and

22

that the officers' testimony regarding incidents of alleged police force *may* be biased. [Citation.]" (*Id*. at p. 103, italics added.)

*Zamora* illustrates the reluctance of the judiciary to invade the fact-finding function of the jury, even when it is necessary to inform them a discovery violation has occurred, and even when the subject violation results in the destruction of potentially exculpatory evidence. In the present case, the prosecution team was definitely late in disclosing Szyperski's supplemental police report. However, that document was eventually made available to defense counsel, and he was able to use it at trial to attack Szyperski's veracity and his investigative techniques. "Better late than never" became an adage because it is often true. Here, it helps explain why the discovery violation at issue here was not quite as egregious as the violation in *Zamora*. And while the circumstances surrounding Szyperski's untimely disclosure of his supplemental report were suspicious, it is important to keep in mind the report did not directly relate to the underlying charges. Rather, it pertained to a single piece of evidence that surfaced during the investigative aspect of the case.

It is also worth remembering that, as a remedy for the report's untimely disclosure, the court precluded the prosecution from adducing testimony from Kevin Diegitz, who presumably would have corroborated Szyperski's account of the letter transfer. The court also took the extraordinary step of allowing the defense to call Scarbrough as a witness to impeach Szyperski about when he tendered the report to the prosecution, which led to Scarbrough's recusal in the case. This was an extraordinary effort to ensure that all of the facts were on the table, and that the jury was not left with a false impression of Szyperski's credibility.

These measures were enough to protect the fairness of the trial, and the trial court properly refused appellant's request to direct the jury how to interpret the prosecution's untimely disclosure of Szyperski's supplemental police report. Because the

23

intentionality and materiality of that late disclosure were matters for the jury to decide, we discern no abuse of discretion in the court's decision.

*Admissibility of Uncharged Sexual Misconduct*

Next, appellant contends the trial court abused its discretion and violated his due process rights by allowing the prosecution to present evidence regarding his sexual activity with Wendy N., who was not named as a victim in the case. Although the court was initially inclined to exclude this evidence, it permitted the prosecution to call Wendy on rebuttal, finding her testimony was more probative than prejudicial. We find no abuse of discretion in this regard.

Wendy testified she met appellant in 1998, when she was in her early twenties and he was attending the police academy. Their first date was limited to kissing and "making out," but on their second date, appellant wanted more than that. While they were kissing on appellant's sofa, he worked his way on top of her and removed her pants. Wendy did not like where this was going, so she told appellant "no, no, no." However, he removed her underwear and penetrated her vagina with his penis against her will for about 10 minutes before ejaculating inside of her. Afterwards, Wendy was filled with shame and regret. She did not call the police because she was embarrassed and because appellant did not use any physical violence against her.

A few weeks later, Wendy went to a barbeque at appellant's house with a friend. Although Wendy was nervous about going, she accepted the invitation hoping appellant would see her as more than just a sex object. But when she arrived at his house and went up to greet him in his room, that hope quickly vanished. Although Wendy was not looking to have sex, appellant removed her clothes and had intercourse with her on his bed. Nothing was said during the sex; she did not tell appellant it was okay, but she did not tell him "no" either. Afterwards, she felt bad and told her friend what happened. Yet, she did not call the police because she "didn't feel like [she] had a good reason to."

Evidence of a defendant's prior bad acts is generally inadmissible to prove his behavior on a specific occasion or his propensity for criminal activity. (§ 1101, subd. (a).) However, such evidence may be admitted to prove some other material fact in the case, such as motive or intent. (*Id.*, subd. (b).) An exception to the propensity rule also exists in cases involving sex crimes. In such cases, "evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [s]ection 1101 if the evidence is not inadmissible pursuant to [s]ection 352." (§ 1108, subd. (a).) So long as the uncharged sex crimes are not barred by section 352, they may be used as propensity evidence in sex crime cases to prove the defendant is disposed to commit such crimes and thus guilty of the charged offense. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911-912.)

Section 352 is not designed to exclude evidence that is merely damaging to the defendant's case. Rather, it is aimed at keeping out evidence that tends to evoke an emotional bias against the defendant based on extraneous considerations. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408.) The determination as to whether evidence rises to this level "'is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence. [Citation.]'" (*People v. Falsetta, supra*, 21 Cal.4th at pp. 917-918, quoting *People v. Fitch* (1997) 55 Cal.App.4th 172, 183.) We will not disturb the trial court's ruling unless the court "'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 534.)

That didn't happen here. Wendy's testimony was actually fairly brief compared to the victims' testimony, and having occurred eight years before the first charged offense arose, the encounters she described were not unduly remote. (See generally *People v. Frazier* (2001) 89 Cal.App.4th 30, 40-41 [upholding admission of evidence regarding 15-year-old sexual offense; *People v. Branch* (2001) 91 Cal.App.4th 274, 284-285 [30-year-old sexual offense not unduly remote].) Nor were they any more

inflammatory than the charged offenses. In fact, Wendy's testimony about what appellant did to her was much tamer than what each of the victims alleged. (Compare *People v. Harris* (1998) 60 Cal.App.4th 727 [where the defendant was accused of simple fondling, trial court erred in admitting evidence he had previously committed an extremely violent sexual attack].) Yet, Wendy's testimony was not so different as to be irrelevant or confusing.

Appellant correctly notes the lack of evidence that appellant was ever punished for what he did to Wendy created a risk the jury might want to convict him of the charged offenses irrespective of his guilt. (See *People v. Harris, supra*, 60 Cal.App.4th at p. 738.) However, because appellant was much more violent and unrelenting to the alleged victims than he was to Wendy, that prospect was highly unlikely. Given everything the jury heard, Wendy's testimony was simply not likely to evoke a solely emotional bias against appellant.

The prospect of prejudice was also minimized by the fact the trial court instructed the jury the incident involving Wendy was relevant only to the issues of motive and intent. (CALCRIM No. 375.) Although, as we have noted, the Legislature has authorized the use of prior sex offenses to show the defendant's propensity for committing such offenses, appellant's conduct with Wendy was not admitted or used for that purpose.

In assailing the trial court's ruling, appellant notes the court appeared to put a lot of stock in the fact Wendy testified on rebuttal after appellant took the stand. We agree with appellant that the timing of Wendy's testimony was a lot less important than the substance of her testimony. But even if the court's decision to admit Wendy's testimony was based on improper reasoning, we must uphold it because it was legally correct. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976 ["""If right upon any theory of the law applicable to the case, (the trial court's ruling) must be sustained regardless of the considerations which may have moved the trial court to its conclusion."""]) For the

26

reasons explained above, the trial court did not abuse its discretion or violate appellant's due process rights by allowing Wendy to testify.

*Alleged Ineffective Assistance of Counsel*

Next, appellant contends his attorney was ineffective for failing to request CALCRIM No. 318, which would have allowed the jury to consider Abigail's prior inconsistent statements for their substantive truth. In order to prevail on this claim, appellant must not only demonstrate his attorney's performance was deficient but that it is reasonably probable he would have obtained a more favorable result had the instruction been given. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) The evidence does not rise to that level in this case.

During trial, Abigail testified on direct examination that appellant pulled off her pants before sodomizing her. However, on cross-examination she admitted telling the police she could not remember how her pants came off. She also acknowledged telling the police her inability to remember was attributable to the fact she was pretty intoxicated when the incident occurred. Asked why her memory was better at trial than when she was interviewed by the police, Abigail said she simply was not prepared for the interview and did not give the officer's questions sufficient thought. But in thinking about the incident at trial, she was able to remember what actually happened.

Abigail also testified she agreed to go on a second date with appellant because she feared appellant had the ability to track her down. On cross-examination, defense counsel tried to establish that was a lie. In attempting to do so, defense counsel got Abigail to admit that during her police interview, she said the reason she saw appellant a second time was "to get as much information about him as possible." Explaining this apparent discrepancy, Abigail testified she also told the police her fear of appellant finding her was a motivating factor behind her decision to see him again.

Appellant contends that had CALCRIM No. 318 been given, the jury "would have then known that it could consider Abigail's prior inconsistent statements not just as impeachment, but as substantive evidence as well. And had it considered those statements as substantive evidence and believed them to be true, it would have found that Abigail was not afraid of appellant and too intoxicated to remember the details surrounding the incident." Appellant claims this would have shifted the jury's assessment of the case in his favor given the fact there was no physical evidence corroborating Abigail's allegations.

However, even without CALCRIM No. 318, there was nothing stopping the jury from considering Abigail's prior inconsistent statements for their substantive truth. Since those statements were made closer in time to the events in question than Abigail's trial testimony, the jurors may have very well believed they were true. But even if they did not, it is unlikely this would have affected the verdict because, in and of themselves, the statements were not particularly damning, and Abigail largely explained them at trial. The jury also knew that Abigail was fairly intoxicated when appellant sexually assaulted her and that she agreed to see appellant again following the assault. The details about how exactly appellant removed her pants and why she agreed to a second date were not as important as these undisputed facts. Considering all the evidence that was presented, we simply do not believe defense counsel's failure to request CALCRIM No. 318 was materially prejudicial to appellant. Therefore, no Sixth Amendment violation has been shown.

*Discovery of Appellant's Personnel Records*

Before trial, appellant filed a *Pitchess* motion for discovery of his *own* personnel file with the Garden Grove Police Department. (See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.) Although *Pitchess* motions typically target the personnel file of the *arresting officer* to show prior complaints of misconduct or excessive force against *that* officer (see, e.g., *People v. Mooc* (2001) 26 Cal.4th 1216), the disclosure

28

requirements apply more broadly to include any information "that is relevant to the defendant's ability to defend against a criminal charge." (*Id.* at p. 1219.) Therefore, the trial court conducted an in camera review of appellant's personnel file and ordered the release of all the information it believed was pertinent to his defense. At appellant's unobjected-to request, we have reviewed the in camera hearing, as well as appellant's personnel file. (*Id.* at p. 1232.) Our examination of these materials reveals the trial court conducted an extremely thorough *Pitchess* hearing and properly ordered the disclosure of all discoverable material in appellant's file. As such, the court did not error in failing to order the disclosure of any additional information. No abuse of discretion has been shown.

*Propriety of Consecutive Sentences*

Appellant was convicted of one count of forcible sodomy as to each of his three victims. The trial court sentenced him to six years (the midterm) on the count involving Abigail. (Pen. Code, § 286, subd. (c)(2).) And it imposed a consecutive term of three years (the low term) on each of the remaining counts, for a total sentence of twelve years in prison. Appellant contends consecutive sentencing on the subordinate counts was improper, but that is not the case.

Because appellant was convicted of a violent sex offense, he was sentenced under the scheme set forth in Penal Code section 667.6. Under that statute, full consecutive sentencing on each subordinate count is required if, as in this case, the defendant's crimes involved separate victims. (Pen. Code, § 667.6, subd. (d).) Appellant argues the separate victims circumstance constitutes a sentence enhancement, and thus the prosecution was required to allege it in the information pursuant to Penal Code section 1170.1 and as a matter of federal due process. (See Pen. Code, § 1170.1, subd. (e) ["enhancements shall be alleged in the accusatory pleading"]; *People v. Bautista* (1998) 63 Cal.App.4th 865, 870 [notice is a central component of due process].) However, the courts have universally rejected this argument.

As explained in *People v. Price* (1984) 151 Cal.App.3d 803, the separate victims circumstance set forth in Penal Code section 667.6, subdivision (d) differs from an enhancement "in that no additional facts beyond commission of the enumerated sex crimes need be proven (or could be pleaded) to invoke that section." (*Id.* at p. 821, relying on *People v. Stought* (1981) 115 Cal.App.3d 740.) That's because the increased punishment arises from the underlying sex crime, not from any additional charge or finding. (*People v. Reynolds* (1984) 154 Cal.App.3d 796, 810-811; *Jensen v. Hernandez* (E.D.Cal. 2012) 864 F.Supp.2d 869, 937 [Penal Code section 667.6, subdivision (d) "only affects the length of the consecutive sentence. It does not change the fact that the consecutive sentence is imposed for the underlying crime"].) Therefore, when, as here, the defendant is "specifically charged with the crimes for which the consecutive terms were imposed . . . [n]o further pleading or proof is required." (*People v. Reynolds, supra*, 154 Cal.App.3d at p. 811; accord, *People v. Mitchell* (1988) 199 Cal.App.3d 300, 306, fn. 7; *People v. Masten* (1982) 137 Cal.App.3d 579, 591-592, disapproved on other grounds in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.)

DISPOSITION

The judgment is affirmed.



BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.

30